### In re the MARRIAGE OF: Ronald J. BARTLEY, Appellant–Respondent,

### and

### Carol Christine Bartley, Appellee–Petitioner.

### No. 87A04–9810–CV–492.

Court of Appeals of Indiana.

June 10, 1999.

---

S. Anthony Long, Boonville, Indiana, Attorney for Appellant.

Frank R. Hahn, Newburgh, Indiana, Attorney for Appellant.

## OPINION

NAJAM, Judge

### STATEMENT OF THE CASE

On June 17, 1996, Carol Christine Bartley ("Chris") filed a petition for dissolution of her marriage to Ronald J. Bartley ("Ron"). The parties entered into a provisional agreement, and the case was scheduled for a final hearing. However, the hearing was vacated while the parties attempted to reconcile. The parties lived together until April of 1998. On April 2, 1998, the court conducted the final hearing. On July 24, 1998, the court issued its Decree of Dissolution of Marriage. Ron filed a motion to correct error, which the court denied. He now appeals.

We affirm in part, reverse in part and remand with instructions.

### ISSUES

Ron presents four issues for review, and we address one issue *sua sponte:*

1. Whether the trial court abused its discretion when it deviated from an equal division of the parties' property.

2. Whether the trial court erred when it awarded Chris the value of the social securi-

ty widow's benefits she forfeited when she married Ron.

3. Whether the trial court erred when it based Ron's child support obligation on past rather than present income.

4. Whether the trial court abused its discretion when it ordered Ron to pay Chris's attorney's fees.

5. Whether the trial court lacked jurisdiction to enter its "Court's Clarification of April 2, 1998 Order."

## FACTS

Ron and Chris were married on June 23, 1990. They had one child during the marriage, Chayna, born in December of 1992. Chris also had one child from a previous marriage, Kristopher, who was twelve years old at the time of the final hearing. Prior to her marriage to Ron, Chris received social security benefits as a result of the death of her first husband, Kristopher's father, both as a widow and on Kristopher's behalf. Chris's widow's benefits of $653.00 each month terminated when she married Ron. After the divorce, Chris will again become eligible for these benefits.

Before Chris married Ron, she had worked at Kimball Electronics and at Drake Corporation in Jasper. Chris left Jasper to move with Ron to his new job with Alcoa in Newburgh. Chris, who has a high school education, then began taking classes at the University of Southern Indiana. Chris is presently employed as a day care worker where she earns $6.50 per hour. She works between twenty-eight and thirty-two hours each week. She intends to continue her college education to earn a degree in either education or business.

In 1997, Ron earned $53,969.09 at Alcoa. In January of 1998, however, Ron was forced to change jobs because several senior employees were transferred to his department. Ron is currently training for a new position at Alcoa, and his hours have decreased.

Through March of 1998, his year-to-date gross earnings were $11,506.

The parties purchased a marital residence in 1991. Ron contributed $25,000 from his 401K at Kimball Electronics, his previous employer, toward purchase of the home. The home's appraised value was $130,000 with a mortgage of $59,816. During the marriage, Ron paid the mortgage and most of the utility bills. Ron also paid for their daughter's dance lessons, but he did not pay for Chris's or Kristopher's clothing. He provided Chris with $60 each week for groceries. Chris used credit cards throughout the marriage to pay for ordinary living expenses for herself and her two children.

Ron participated in NASCAR and NCAA pools at work and lost money investing in the silver market. Around the time the parties separated, Ron borrowed $7,500 from his 401K plan because he was "running low on cash." Ron used $2,900 of the money he borrowed to purchase a four wheeler, which he wrecked and sold for $700.

In its dissolution decree, the trial court awarded Chris 64% of the parties' marital assets and attorney's fees. Ron now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### Issue One: Unequal Property Distribution

Ron asserts that the trial court abused its discretion when it awarded Chris a greater percentage of the parties' marital property. He argues that the evidence presented at the final hearing does not support a deviation from the presumptive equal division.

 Under Indiana Code Section 31–1–11.5–11(b),[1] the trial court shall divide the property of the parties in a just and reasonable manner, and that includes property owned by either spouse prior to the marriage, acquired by either spouse after the marriage and prior to final separation of the

1. Effective July 1, 1997, Indiana Code Section 31–1–11.5–11 was recodified at Indiana Code Sections 31–15–7–4 and 31–15–7–5 without substantive changes. Chris filed her petition for dissolution, however, in June of 1996. Thus, we cite to the relevant provisions of the repealed law throughout the opinion.

parties, or acquired by their joint efforts. *In re Marriage of Coyle,* 671 N.E.2d 938, 941 (Ind.Ct.App.1996). An equal division of the marital property is presumed to be just and reasonable. IND.CODE § 31–1–11.5–11(c); *Cowden v. Cowden,* 661 N.E.2d 894, 895 (Ind. Ct.App.1996). However, that presumption may be rebutted by a party who presents relevant evidence of any of the following factors:

(1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court may deem just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties.

IND.CODE § 31–1–11.5–11(c). If the trial court determines that a party opposing an equal division has met his or her burden under the statute, the court must, in its findings and judgment, based on the evidence, state its reasons for deviating from the presumption that an equal division is just and reasonable. IND.CODE § 31–1–11.5–11(c); *see also In re Marriage of Davidson,* 540 N.E.2d 641, 646 (Ind.Ct.App.1989).

▮ When a party challenges the trial court's division of marital property, he must overcome a strong presumption that the court considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal. *Coyle,* 671 N.E.2d at 942. While the applicable statute presumes that an equal distribution is just and reasonable, the division of marital assets is a matter committed to the sound discretion of the trial court. *Chase v. Chase,* 690 N.E.2d 753, 755 (Ind.Ct.App.1998). On appeal we must decide whether the trial court's decision is clearly erroneous or constitutes an abuse of discretion. *Id.* Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court. *Bloodgood v. Bloodgood,* 679 N.E.2d 953, 957 (Ind. Ct.App.1997). We will reverse a division of marital property for an abuse of discretion only when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, when the trial court has misinterpreted the law or has disregarded evidence of factors listed in the controlling statute. *Hodowal v. Hodowal,* 627 N.E.2d 869, 871 (Ind.Ct.App.1994), *trans. denied.*

In this case, the dissolution decree provides three reasons for the unequal division. The decree states:

S. That [Chris] is entitled to more than one-half of the marital equity for the reasons that she resigned full-time employment at the request of [Ron] to assume full-time housewife responsibilities and to care for her child and eventually the child of the parties; further, that despite significant income [Ron] has dissipated marital assets and failed to pay and provide for household and family living expenses on account of his gambling which has resulted in the present amount of unsecured debt of the parties, and that [Chris] earns at this time far less than [Ron].

On appeal, Ron challenges two of the court's three reasons for awarding Chris a greater share of the marital estate: that Chris resigned full-time employment at Ron's request and that Ron dissipated marital assets.

▮ First, Ron admits that "the evidence is inconsistent on the issue of whether or not [Chris] resigned full-time employment at Ron's request to assume the duties of a housewife and mother." By conceding that conflicting evidence exists on this issue, Ron asks that we reweigh the evidence. The evidence most favorable to the court's judgment shows that Chris and Ron were mar-

ried when Ron decided to take a new job with Alcoa. Chris quit her job at Drake Corporation to move with Ron. After the parties relocated, Chris worked in day care and a few other part-time jobs. This evidence supports the unequal division. *See* IND.CODE § 31–1–11.5–11(c)(3) and (c)(5).

▆▆▆ Ron also challenges the court's determination that Ron dissipated marital assets. Dissipation has been described as the frivolous, unjustified spending of marital assets which includes the concealment and misuse of marital property. *Coyle,* 671 N.E.2d at 943 (citing *Volesky v. Volesky,* 412 N.W.2d 750, 752–53 (Minn.Ct.App.1987)). In *Coyle,* this court held that the proper test to determine whether a spouse dissipated marital assets is "whether the asset was actually wasted or misused." *Id.* at 944. Factors that a trial court may consider in determining whether assets have been dissipated include: (1) evidence of an intent to hide, divert or deplete the asset; (2) whether the expenditure was made for a purpose entirely unrelated to the marriage; (3) the remoteness in time in relation to the filing of the dissolution petition; and (4) whether the expenditure was excessive or *de minimis. Id.* at 943.

▆▆▆ During cross-examination, Chris's counsel questioned Ron about how he had spent $3,500 of the parties' tax refund check, which he had deposited into his own checking account. Counsel then asked him about numbers he had written on a piece of paper in the following colloquy:

Q: It says truck $3,000, and d-f, what is that? What is d-f?

A: It's not dog food, not $2,000. I don't know what that is.

Q: It says $3,000 truck, $2,000 df, $2,000 160 loan, $8,000—

A: Silver.

Q: Silver, what's that?

A: It's an account I opened up.

* * * * *

Q: This $5,000 NCAA NASCAR, what's that?

A: We have pools at work and we get into them.

Q: And you got $5,000?

A: Not into that.

Q: What's the $5,000 mean? It says A–Z–

A: That's Aztar, Casino Aztar.

Q: You mean you lost it at Casino Aztar?

A: We get in pools every week, NASCAR and the NCAA tournament and they've got some guys that go down to the boat and they've got simulcast, I've gone down there twice, and we all throw in some money.

Q: What's the $5,000 mean?

A: No, I didn't win it. We are kind of in the red on that.

Q: So that's a debt?

A: No.

Q: You are down $5,000 on the pool?

A: No.

* * * * *

Q: So you reimbursed yourself out of the tax refund check to even up with the guys?

A: Just partial, yes.

Q: How much?

A: Two or three hundred dollars.

Q: So that is for gambling on the NCAA tournament and whatever NASCAR race is and Casino Aztar. You would reimburse yourself for some loss in the silver market?

A: No. On the silver, I had $8,000 over a year and a half and basically it was a scam and it went down the tubes.

In addition, Chris testified that during the marriage Ron normally gave her $60 each week to buy groceries for the family of four. She also stated that she was expected to pay for "anything that we needed above and beyond the basic necessities." In doing so, Chris accumulated credit card debts. The parties' W–2 forms show that Ron earned approximately $53,000 while Chris earned approximately $10,000 in 1997. After hearing this evidence, the trial court made the following comments regarding Ron's spending habits during the marriage:

I am going to have to recalculate the amount of support. It is going to be some-

where between the two figures that I've got here, but I think one of the problems here is the silver mining and NASCAR and football games is dived [sic] into your income and those things you don't need to invest in so I would look at it here that with the house payments and the $100 a week for groceries and the utility payments, you [Ron] spend about $18,000—$19,000 and you've got about $40,000 on your lasted [sic] one, so that leaves $21,000 that goes someplace that is not around.

■ These comments, in addition to the reasons specified for awarding Chris a greater percentage of the marital property, express the court's concern with the disparity between Ron's income and the amount of money he contributed to the marriage. During the marriage, Ron used a substantial portion of his income for personal expenditures rather than for purposes related to his marriage or family. For example, Ron testified that around the time the parties' separated, he borrowed $7,500 from one of his 401K plans because he was "running a little low on cash." He used a portion of that money to buy a four wheeler, which he wrecked and sold for $700. The evidence also shows that Chris was obliged to use credit cards to pay for basic living expenses for herself and her two children. We conclude that the court did not abuse its discretion when it considered the manner in which Ron spent his income and its impact on Chris to justify the unequal property distribution. *See* IND.CODE § 31–1–11.5–11(c)(4) (the court may consider a spouse's conduct during the marriage as related either to the *disposition or dissipation* of property). We find no error.[2]

### Issue Two: Social Security Widow's Benefits

The trial court entered the following finding regarding the parties' marital estate:

J. The parties are the owners of real estate located at 7700 Jeremy Lane, Newburgh, Warrick County, Indiana. [Chris]

shall be the sole owner of said real estate. [Ron] shall be responsible for the April 1998 mortgage payment. [Chris] shall be responsible for the mortgage payments commencing in May 1998 and thereafter. [Chris] shall refinance the mortgage obligation within six (6) months to relieve [Ron] of any further responsibility thereon. The value of the property is $130,000 with a mortgage of $59,816.40, and equity of $70,183.60. *[Ron] invested pre-marital funds of $25,000 into said property and [Chris] waived $62,000 in social security payments for said marriage; and that net equity is $33,183.00.* [Chris] shall be obligated to pay $16,591.80 to [Ron] for his interest in said real estate.

(emphasis added). Ron asserts that the trial court erred when it treated social security widow's benefits forfeited by Chris as marital property and then considered those benefits in dividing the equity in the marital residence.

### a. Marital Property

■ As we have already discussed, Indiana Code Section 31–1–11.5–11(b) provides that "the court shall divide the property of the parties, whether owned by either spouse prior to the marriage, acquired by either spouse in his or her own right after the marriage and prior to the final separation of the parties, or acquired by their joint efforts, in a just and reasonable manner...." Property owned by the parties, regardless of its source, shall be placed into the marital pot and divided. *Castaneda v. Castaneda,* 615 N.E.2d 467, 469 (Ind.Ct.App.1993).

■ In this case, the trial court did not include Chris's forfeited social security benefits in the marital pot. The court, however, awarded $62,000.00 to Chris for the benefits she "waived" when it divided the equity in the marital residence. In doing so, the court treated these benefits as if they had been owned by Chris prior to the marriage. *See* IND.CODE § 31–1–11.5–11(b).

---

**2.** In his Summary of the Argument, Ron alleges that the trial court improperly attributed fault to him when it distributed the parties' marital property and ordered him to pay Chris's attorney's fees. It is well-established that fault is not relevant to dissolution proceedings except as related to the disposition or dissipation of marital assets. *Hunt v. Hunt,* 645 N.E.2d 634, 637 (Ind.Ct.App. 1994). There is no evidence in the record to support Ron's allegation.

■ The widow's benefits that Chris relinquished were an opportunity cost of her marriage to Ron. No value can be attributed to these benefits because they were contingent on her marital status and had never vested. The parties to a marriage may forego income or benefits when they marry, but even when the value can be calculated, these lost opportunities never constituted marital property. *See* IND.CODE § 31–1–11.5–11(b). To hold otherwise would invite an endless variety of claims in dissolution proceedings regarding benefits or income foregone as a result of the marriage. We conclude that the trial court erred to the extent that it treated social security widow's benefits relinquished by Chris when she married Ron as marital property.

#### b. Factors in Dividing Marital Property

We have determined that social security widow's benefits forfeited by a spouse upon marriage are not marital property. The question remains, however, whether these benefits may be considered as a factor in dividing marital property.

■ A trial court uses the factors enumerated in Indiana Code Section 31–1–11.5–11(c) in two ways: first, the court weighs the factors against the presumption of an equal property division; second, if the evidence rebuts the presumption, the court uses the factors as a framework for the property division. *Cowden,* 661 N.E.2d at 895–96. In this case, the trial court properly placed the marital residence in the marital pot for division. Next, in calculating the amount of equity to be distributed between the parties, the court considered two factors: (1) Ron had borrowed $25,000 from his 401K plan to use as a down payment on the home; and (2) Chris would have received $62,000 in widow's benefits if she had not married Ron. The parties do not dispute that the court properly considered Ron's contribution to the down payment for the marital residence in distributing the parties' equity. *See* IND.CODE § 931–1–11.5–11(c)(1) (court may consider the contribution of each spouse to the acquisition of marital property). We now address whether it was proper for the court to consider Chris's widow's benefits.

■ Trial courts are *required* to consider certain unvested interests in dividing marital property, even though the interests themselves are not divisible. *Hacker v. Hacker,* 659 N.E.2d 1104, 1111 (Ind.Ct.App.1995) (emphasis in original). Other types of property in which the spouse has no present possessory interest *may* be considered as relevant to the parties' earning abilities or economic circumstances. *Id.* However, this court has determined that certain interests are simply too remote or speculative to be relevant in allocating marital property.

■ For example, in *Hacker,* we held that the trial court could not consider the value of a husband's potential inheritance of a family farm in determining a just and reasonable division of the marital property. *Id.* at 1111–1112. Similarly, in *McNevin v. McNevin,* 447 N.E.2d 611, 616 (Ind.Ct.App. 1983), we held that a wife's unliquidated tort claim was neither divisible as marital property nor could it be considered a factor in awarding property settlements. *Cf. In re Marriage of Dall,* 681 N.E.2d 718, 722 (Ind. Ct.App.1997) (an equitable interest in real property owned by a third party should not be included in the marital estate; the interest in the property, however, can be considered in dividing the couple's marital assets). If potential interests in real property or unliquidated tort claims are too remote or speculative to be considered as factors in allocating marital property, it follows that the $62,000.00 in social security widow's benefits Chris did not receive and will not receive in the future should not be considered. Chris relinquished her widow's benefits when she married Ron and, thus, the benefits had no chance of being realized. We conclude that the trial court erred when it considered Chris's forfeited social security widow's benefits in allocating the marital assets.

■ Still, the trial court articulated three valid reasons to support the unequal distribution of marital property: (1) Chris left her job to follow Ron and raise the children; (2) Ron's dissipation of marital assets; and (3) the disparity of income between the parties. We cannot presume, however, that the trial court would reach the same division of prop-

erty once Chris's social security widow's benefits are excluded from consideration in dividing the equity in the marital estate. Although we affirm the trial court's decision that an unequal distribution is just and reasonable in this case, we remand with instructions that the court redistribute the equity in the marital estate, exclusive of any consideration of the $62,000 in widow's benefits Chris would have received had she not married Ron.[3]

### Issue Three: Child Support Calculation

Next, Ron argues that the trial court erred when it based his child support obligation on his 1997 income rather than his current income. The court's relevant findings on this issue provide:

A. The evidence established [Ron] received gross earnings for 1994, 1995, 1996 and 1997 during which time he received compensation above his hourly rate for overtime and shift pay; *that he has reduced temporary income by reason of training and is earning $13.49 per hour; the Court considers his 1996 income to be similar to present earnings and ability to earn for an adjusted gross of $749.92,* [Chris] $322.57, and child care of $50.00 per week for a weekly support obligation of $132.00 per week, relating back to April 3, 1998, paid through the Clerk of the Warrick Circuit Court. By reason of budgetary necessity of [Chris], Court will activate an income withholding order to [Ron's] employer, Alcoa.

(emphasis added). Contrary to Ron's assertion, the trial court did not base Ron's child support obligation on his 1997 income. Instead, the dissolution decree clearly shows that court considered Ron's present and temporary reduced income as a result of his change in position at Alcoa. The court found Ron's present income comparable to his 1996 income and based Ron's support obligation on that amount. Thus, we reject Ron's argument.

### Issue Four: Attorney's Fees

Finally, Ron maintains that the trial court abused its discretion when it ordered Ron to pay Chris's attorney's fees. We disagree.

In dissolution proceedings, the trial court may order a party to pay a reasonable amount for attorney's fees. IND. CODE § 31-1-11.5-16(a).[4] In awarding attorney's fees, the court has broad discretion. *Bloodgood,* 679 N.E.2d at 958. We will reverse the award only if the court's decision is clearly against the logic and effect of the facts and circumstances. *Id.* In assessing attorney's fees, the court may consider such factors as the resources of the parties, the relative earning ability of the parties, and other factors which bear on the reasonableness of the award. *Meade v. Levett,* 671 N.E.2d 1172, 1178 (Ind.Ct.App.1996). An award of attorney's fees is proper when one party is in a superior position to pay fees over the other party. *Reese v. Reese,* 671 N.E.2d 187, 192 (Ind.Ct.App.1996), *trans. denied.*

Here, the evidence shows that Ron has a greater earning ability than Chris. Still, Ron argues that because the dissolution decree is silent as to why the court awarded Chris attorney's fees, the court must have determined that Ron was in a superior position to pay the fees. He contends that this is a "misconception" and points out that a substantial portion of the marital assets he received consist of his 401K plans, which will result in state and federal tax penalties should he withdraw the funds. Ron also argues that given his job change at Alcoa, his salary has decreased while Chris will earn more after the divorce because her widow's benefits will be reinstated.

Regarding Ron's tax penalty argument, we have held that although the trial court must consider the tax consequences of its property distribution, only tax consequences necessarily arising from the plan of distribution are to be taken into account. *See DeHaan v. DeHaan,* 572 N.E.2d 1315,

---

**3.** Chris will receive social security widow's benefits again once the parties' divorce is final. In distributing the marital property, the trial court may consider the extent to which these benefits will affect Chris's economic circumstances at the time the disposition of property becomes effective. *See* IND.CODE § 31-1-11.5-11(c)(3).

**4.** Now codified at Indiana Code Section 31-17-7-1.

1327 (Ind.Ct.App.1991) (only immediate tax consequences of the property distribution may be considered), *trans. denied.* The trial court in this case did not order Ron to withdraw funds from his 401K plan. Rather, Ron merely speculates that he may in the future withdraw from those funds as a result of the unequal property distribution. His remaining arguments amount to a request that we reweigh the evidence presented to the trial court. We find no abuse of discretion.

### Issue Five: Clarification Order

On April 26, 1999, while this appeal was pending, Ron filed a Petition for Writ of Certiorari and a Motion for Leave to Amend Brief in which he sought review of an order entered on April 20, 1999 entitled "Court's Clarification of April 2, 1998, Order." We issued a writ of certiorari directing the Clerk of Warrick County to certify and transmit copies of the "Court's Clarification of April 2, 1998, Order" and the chronological case summary.

▮▮▮▮ Indiana Appellate Rule 3(A) states in part that "[e]very appeal shall be deemed submitted and the appellate tribunal deemed to have acquired general jurisdiction on the date the record of proceedings is filed with the clerk of the Supreme Court and Court of Appeals." It is well-settled that the trial court is deprived of further jurisdiction when appellate jurisdiction is acquired. *Schumacher v. Radiomaha, Inc.,* 619 N.E.2d 271, 273 (Ind.1993). Here, Ron filed the Record of Proceedings on December 18, 1998, and the trial court issued its clarification order on April 20, 1999. Therefore, the trial court lacked jurisdiction to issue the order, and the order was void at its inception.[5]

Affirmed in part, reversed in part and remanded.

GARRARD, J., and KIRSCH, J., concur.

---

5. In his petition, Ron asserts that the trial court's "clarification order" impermissibly modified the original dissolution decree. Without deciding the issue, the trial court's "clarification order," which divided equally Ron's Alcoa 401(k) plan, appears to have modified rather than clarified the original decree, which made Ron the "sole owner" of his interest in the plan.