**In re the Marriage of Julie Marie BOJRAB, Appellant–Petitioner,**

v.

**George David BOJRAB, Appellee–Respondent.**

No. 02A03–0204–CV–127.

Court of Appeals of Indiana.

April 16, 2003.

✑281

718

Nana Quay–Smith, Karl L. Mulvaney, Candace L. Sage, Denise W. Chavis, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellant.

Stephen P. Rothberg, Fort Wayne, IN, Attorney for Appellee.

## OPINION

MATTINGLY–MAY, Judge.

Julie Marie Bojrab ("Wife") and George David Bojrab ("Husband") appeal the trial court's dissolution of their marriage. Wife appeals raising six issues, and Husband cross-appeals raising four additional issues. We consolidate their issues and reorder and restate them as:

1. Whether the trial court erred by declining to adjust the temporary support and maintenance paid by Husband when his income dropped during the pendency of the proceedings;

2. Whether the trial court erred when ruling on Husband's motion to correct er-

ror by granting to Husband additional money from the proceeds of the sale of the marital residence;

3. Whether the trial court's division of assets was clearly erroneous;

4. Whether the trial court erred when it conditioned Wife's custody of the parties' children on her continuing to reside in Allen County; and

5. Whether the trial court abused its discretion in determining child support. We affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

In 1991, Wife and Husband were married in Wife's hometown, Livonia, Michigan. When the couple got married, Husband had just finished medical school, and they moved to Fort Wayne, Indiana, where Husband began a one-year internship. In 1992, the couple moved to Indianapolis, where Husband completed a three-year residency program in anesthesiology. While they lived in Indianapolis, Wife completed her baccalaureate degree, with a major in psychology and a minor in nutrition.

After obtaining her degree, Wife got a job at Jenny Craig Weight Loss Clinic, where she worked as a weight loss counselor for four months until she began having complications with her first pregnancy. The parties agreed that Wife would not be employed after they had children. In November of 1993, the parties' first child, D.G.B., was born. After Husband's residency, the family moved back to Fort Wayne, where Husband's extended family lives and where Husband began practicing medicine. In September of 1995, the parties' second child, A.E.B., was born. Then in February of 1998, the parties' third child, N.E.B., was born.

On November 3, 1999, the parties separated when Wife took the children to Livonia and stayed with her mother. Thereafter, Wife told Husband that she did not plan to return to the marital residence. Wife filed a petition for dissolution of marriage on January 10, 2000. On January 27, Wife filed a notice of intent to change residence, which advised the trial court that Wife and her children had moved to Livonia. On February 2, the trial court granted Wife possession of the marital residence and temporary custody of the parties' minor children with the condition that neither party could move the children out of Indiana or more than 100 miles from Allen County without the court's approval. Also on that date, Wife obtained a temporary restraining order to prevent Husband from coming into the marital residence.

In December of 2001, the court held hearings. Then, on March 28, 2002, the trial court entered its dissolution decree that included extensive findings of fact and conclusions of law. In part, the order gave custody of the children to Wife if she remained in Allen County, ordered that Husband pay $537.00 per week in child support, gave Husband visitation in accordance with the parenting time guidelines, denied Wife's request for rehabilitative maintenance, ordered the marital residence sold and the proceeds divided between the parties, awarded to Wife 60% of the marital assets, and ordered Husband to pay $60,000 toward Wife's attorney fees.

On April 26, 2002, Wife filed a Notice of Appeal. On April 29, Husband filed a motion to correct error. Wife filed a motion objecting to Husband's motion to correct error. On June 18, 2002, the trial court granted Husband's motion in part, providing that Husband was to receive additional proceeds from the sale of the marital residence. Both parties appeal.

Additional facts will be provided where necessary.

## DISCUSSION AND DECISION

### 1. Temporary Support and Maintenance

■ Husband alleges the trial court erred by declining to adjust, when Husband's income decreased substantially due to a change in employment, the temporary support and maintenance he was paying to Wife during the pendency of the proceedings. Wife responds by claiming, first, that Husband waived this argument by failing to bring an interlocutory appeal of the trial court's denial of Husband's request for modification and, second, that Husband's argument fails on the merits.

■ Ind. Appellate Rule 14(A) provides parties may appeal certain types of interlocutory orders made by the trial court by filing a Notice of Appeal within thirty days of the entry of the order. A party may appeal as a matter of right an order "[f]or the payment of money." *Id.* An order requiring one party to pay temporary support and maintenance to another party is an order for the payment of money. *Burbach v. Burbach*, 651 N.E.2d 1158, 1162 (Ind.Ct.App.1995). Consequently, the trial court's denial of Husband's request for modification was an appealable interlocutory order. *Id.* By failing to appeal that order within thirty days of its entry, Husband waived any error that occurred, and he may not now appeal the interlocutory order on appeal of the final judgment. *See Crowley v. Crowley*, 708 N.E.2d 42, 50 (Ind.Ct.App.1999).

Because Husband waived any error that occurred, we need not address whether the trial court abused its discretion when it did not adjust Husband's temporary support obligation.

### 2. Motion to Correct Error

■ Wife claims the trial court's ruling on Husband's motion to correct error was erroneous. Specifically, Wife argues the trial court erred by granting to Husband additional money from the sale of the marital residence. We review the trial court's decision to grant or deny a motion to correct error for an abuse of discretion. *Stott v. Stott*, 737 N.E.2d 854, 857 (Ind.Ct. App.2000). We reverse only if the trial court's decision was against the logic and effect of the facts and circumstances before the court, "without reason," or "based upon impermissible reasons or considerations." *Dughaish ex rel. Dughaish v. Cobb*, 729 N.E.2d 159, 167 (Ind.Ct.App. 2000), *reh'g denied, trans. denied.*

The facts underlying this issue are as follows. On February 2, 2000, the trial court entered a temporary order that gave possession of the marital residence to Wife and required Husband to pay mortgage, insurance, and tax obligations on the residence. Presumably, all such payments were made. Then, in its final order, the trial court ordered: 1) the house be sold; 2) pending sale, Husband was to pay the mortgage, property taxes and insurance; 3) upon sale, Husband would receive forty percent of the net proceeds while Wife would receive sixty percent of the net proceeds; and 4) determination of the net proceeds would include subtraction of "the monthly principle [sic] payments, taxes and insurance paid by [Husband] from January 10, 2000 through the date of closing" from the gross sale proceeds. (Appellant's App. at 165–66.)

■ Husband filed a motion to correct error in which he claimed the trial court erred in its division of the proceeds from the sale of the marital residence. The trial court granted Husband's motion in part, concluding "the failure to credit and reimburse [Husband] for the payment of the

monthly principle [sic] *and interest* payments on the mortgaged indebtedness at the time of the sale of the marital residence was error." (*Id.* at 191.) (Emphasis in original.) Consequently, the trial court ordered that Husband "shall be reimbursed from the proceeds of the sale of the marital residence an amount equal to the monthly principle [sic] and interest mortgage payments paid by him from January 10, [2000][1] to the date of closing." (*Id.*)

Wife claims that the trial court erred when it granted Husband's request for additional money from the sale of the marital residence because it "changed the overall division of assets and created a monetary windfall." (Appellant's Br. at 42.) To support this claim, Wife argues "granting [Husband] 100% reimbursement for interest payments places the entire responsibility for such debt upon [Wife]." (*Id.* at 44.) We disagree.

 The marital estate is to be closed at the time of the filing of the petition for dissolution. *Wilson v. Wilson*, 732 N.E.2d 841, 846 (Ind.Ct.App.2000) ("We agree with Husband that the marital pot closes on the date the petition for dissolution is filed."), *trans. denied.* Wife filed the petition for dissolution on January 10, 2000. After that date, Husband paid all mortgage payments. After the trial court granted Husband's motion to correct error, Husband was reimbursed for all payments made after January 10, 2000. Essentially, the trial court restored the parties to their position when the petition for dissolution was filed.

Moreover, reimbursing Husband for the interest payments did not place *all* of the responsibility for the marital debt on Wife. Rather, the interest payments were returned to Husband from the equity in the house—40% of which was to be given to Husband under the decree. Consequently, the parties divided the cost of the interest payments after the date of the petition. To the extent Wife was responsible for more of the interest than Husband, pursuant to her entitlement to 60% of the net proceeds from the house, such difference does not amount to an abuse of the trial court's discretion in light of the fact that Wife lived in the house for over two years without making a house payment.

The trial court did not abuse its discretion when it granted in part Husband's motion to correct error.

### 3. *Division of Marital Assets*

Both Wife and Husband claim that the trial court erred when it divided the marital assets. Wife argues the trial court erred because it failed to divide stocks that were in the marital estate. Husband argues the trial court erred because it included Husband's furniture when it did not include Wife's earrings, because it failed to consider the amount of temporary maintenance Husband had paid to Wife during the proceedings, and because it failed to consider the inheritance Wife had disclaimed.

 A trial court has discretion to divide the assets between divorcing parties. *Akers v. Akers*, 729 N.E.2d 1029,

---

**1.** The trial court's ruling on Husband's motion to correct error indicated the year was 2002. Husband filed a motion for nunc pro tunc order to correct the date to 2000. In its ruling on his motion for entry of a nunc pro tunc order, the trial court determined that its order should have indicated that *"January 10, 2000* is the proper effective date of the inter-

est calculation." (Appellant's App. at 203.) (Emphasis in original.) Accordingly, the trial court sought leave of this court to correct the record to reflect the appropriate date. We grant the trial court's request and read the order on the motion to correct error to indicate that change is effective as of January 10, 2000.

1031–32 (Ind.Ct.App.2000). If, on appeal, a party challenges division, that party must "overcome a strong presumption that the court considered and complied with the applicable statute." *Id.* (quoting *In re Marriage of Bartley,* 712 N.E.2d 537, 542 (Ind.Ct.App.1999)). When we review the division, our focus is on what the court did, not what the court could have done. *Akers,* 729 N.E.2d at 1032. Even if the facts and reasonable inferences might allow us to reach a conclusion different from the one reached by the trial court, we will not substitute our judgment for the trial court's unless the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

To make our decision, we consider only the evidence favorable to the judgment. *Goodman v. Goodman,* 754 N.E.2d 595, 599 (Ind.Ct.App.2001), *reh'g denied.* We may not reweigh the evidence or reassess the credibility of the witnesses. *Akers,* 729 N.E.2d at 1032. Where, as here, the trial court entered findings and conclusions pursuant to a party's request, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *Goodman,* 754 N.E.2d at 599. We consider the court's disposition of marital property "as a whole, not item by item." *Krasowski v. Krasowski,* 691 N.E.2d 469, 473 (Ind.Ct.App.1998).

## A. Stocks

Wife claims that, during the marriage, the parties owned stock in Communication Intelligence Corporation, which Husband sold for $9,800. Wife included this value on her marital estate balance sheet, and Husband's counsel stipulated to the inclusion of the proceeds in the marital estate. Nevertheless, the trial court failed to include the value in its division of the marital estate.

Wife claims that the trial court erred by failing to include the $9,800 in the marital estate. In addition, because the trial court divided all assets such that Wife received 60% of the marital estate, Wife claims that she should receive another $5,880 from the estate. Husband acknowledges that the trial court failed to include the $9,800 in the marital estate, but claims that the error was harmless. Specifically, Husband claims, "[Wife] cannot now complain that she did not receive an asset to which she was entitled simply because the precise mathematical calculation with the CIC stock would not have resulted in an exact 60%–40% differential, particularly with the asset values at issue." (Appellee/Cross–Appellant's Br. at 31.)

We agree with Wife that the trial court erred by failing to include an asset in the marital estate. Nevertheless, in light of the fact that we must review the trial court's distribution of assets as a whole and not item by item, we find Husband's harmless error argument persuasive. The trial court found the net value of the marital estate, not including the marital residence, was $831,208.00. The estimated value of the marital residence was $575,000.00; however, it was subject to an unidentified amount of mortgaged indebtedness. Assuming no equity in the house, the value of the stocks in question amounts to just over one percent of the marital estate. Given the fact that Wife received 60% of the marital estate, the trial court's distribution of the assets as a whole was not an abuse of discretion. *See, e.g., Elkins v. Elkins,* 763 N.E.2d 482, 486–87 (Ind.Ct.App.2002) (holding erroneous inclusion of asset in marital estate was harmless error where inclusion meant wife received 56.5% of the marital estate rather than 57.5% of the marital estate).

### B. *Furniture, but not Earrings*

Husband claims that the trial court erred because it included his furniture in the marital estate but did not include Wife's diamond earrings in the marital estate. The dissolution court has the responsibility to determine whether property is part of the marital estate. *In re Marriage of Dall,* 681 N.E.2d 718, 723 (Ind.Ct.App.1997). Typically, property acquired after the final separation is excluded from the marital estate. *Macher v. Macher,* 746 N.E.2d 120, 125 (Ind.Ct.App. 2001). The date of final separation is "the date of filing of the petition for dissolution of marriage." *Wilson,* 732 N.E.2d at 846.

Regarding these assets, the trial court found:

> 95. The parties have stipulated and agreed to the division of the personal property, household goods, and furnishings. The parties also stipulate that the division is equitable.

> * * * * *

> 100. Prior to November 3, 1999, the parties paid down payments to Boyles ($9,060) and to Hendrix ($3,681) for furniture which was delivered to [Husband] post filing. [Husband] maintains possession of those furniture items, and he paid for the balance due at the time of delivery. Since the down payments came from the marital estate to secure chattle [sic] received and retained after separation, the down payments are assets of the estate.

(Appellant's App. at 158–59.)

First, Husband bought the earrings for Wife before she filed for divorce. Consequently, the earrings were properly included in the marital estate. However, the parties stipulated that each would keep their separate personal property, and they stipulated that such division was equitable.

Therefore, the earrings were properly excluded from the assets the trial court had to divide.

Second, contrary to Husband's allegation, the trial court did not include his furniture in the marital estate. Instead, it included the value of the down payments the parties made before their separation. At the time the petition for dissolution was filed, Husband did not have the furniture. Rather the parties owned a cash deposit paid on undelivered furniture. Such cash deposit was not "personal property" set aside to Husband under the agreement that each could take equitably his or her own personal property. Because the down payment was not personal property, the trial court did not abuse its discretion by including that amount in the marital estate it was dividing.

### C. *Temporary Maintenance*

Husband claims that because the final distribution of property did not credit him for his temporary maintenance payments to Wife during the proceedings, those payments constituted an "unlawful transfer of post[-]petition property." (Appellee/Cross–Appellant's Br. at 43) (capitalization removed). A trial court has discretion to determine whether it will give a party credit in the final division of property for temporary support and maintenance paid during the proceedings. *Rodgers v. Rodgers,* 503 N.E.2d 1255, 1258 (Ind.Ct. App.1987), *reh'g denied, trans. denied.* We will disturb its decision only for an abuse of that discretion. *Id.*

Ind.Code § 31–15–7–4 provides, in pertinent part:

> (a) In an action for dissolution of marriage under IC 31–15–2–2, the court shall divide the property of the parties, whether:

(1) owned by either spouse before the marriage;

(2) acquired by either spouse in his or her own right:

 (A) after the marriage; and

 (B) before final separation of the parties; or

(3) acquired by their joint efforts.

Husband claims that requiring him to pay temporary maintenance to Wife without giving him credit for such payments in the final distribution of assets violates that statute because it is the equivalent of giving Wife assets he acquired after final separation of the parties.

Ind.Code § 31–15–4–8 permits the trial court to "issue an order for temporary maintenance or support in such amounts and on such terms that are just and proper." While such order shall not "prejudice ... the rights of the parties ... as adjudicated at the final hearing in the proceedings," Ind.Code § 31–15–4–13, the trial court has discretion to determine how to treat the temporary maintenance at the final distribution. *Rodgers,* 503 N.E.2d at 1258. Accordingly, we have held that a trial court did not abuse its discretion when it accounted for the temporary maintenance in the final distribution, *Fiste v. Fiste,* 627 N.E.2d 1368, 1372 (Ind.Ct.App. 1994) (disapproved on other grounds by *Moyars v. Moyars,* 717 N.E.2d 976, 979 n. 2 (Ind.Ct.App.1999), *trans. denied*), but we have also held that a trial court did not abuse its discretion when it refused to credit temporary support payments against a final distribution. *Rodgers,* 503 N.E.2d at 1258.

Husband claims that the trial court should have given him credit for the payments he made because Wife delayed prosecuting the proceedings. Specifically, he alleges "the record shows conclusively that Wife litigated extensively over issues which proved to be meritless, and sought a lengthy evidentiary hearing on a baseless contempt allegation against [Husband] concerning claimed transfers of property in violation of a court order." (Cross–Appellant's Reply Br. at 13.) However, Husband fails to cite portions of the record to support these allegations and fails to explain what the "meritless" issues were. Accordingly, we cannot say the trial court abused its discretion when it did not give Husband credit for the temporary maintenance payments.

D. *Disclaimed Inheritance*

■ Husband claims the trial court erred when dividing the marital estate by failing to take into consideration the fact that Wife waived her portion of a large inheritance from her father. Essentially, Husband argues Wife's waiver amounted to a disposition of marital assets that should have reduced her share of the marital estate under Ind.Code § 31–15–7–5(4).

Regarding Wife's waiver of inheritance, the trial court found:

90. On February 6, 1992, [Wife's] father died intestate. At his death, [Wife's] father owned real estate in the town of Ramullah located in the disputed region in the Middle East known as the West Bank.

91. [Wife's] family culture and tradition, requires that real estate held by the father is to pass upon the father's death to the eldest male child.

92. In 1994, the [Wife's] mother traveled to the West Bank and secured documentation from the Archdiocese of the Orthodox Church in Jerusalem in order to effect the transfer of property according to Middle Eastern cultural traditions.

93. The waivers secured by the mother were provided to each sibling in the [Wife's] family for signature. Each

younger sibling waived the right to inherit the realty and declined to accept consideration offered in support of the waiver in the amount of $5,000.00.

94. The value of the property, disputed by the parties, is irrelevant in that the court finds that [Wife's] decision to waive her right to inherit was based on a recognized and well established cultural custom and was not a dissipation of a marital asset.

(Appellant's App. at 158.) Moreover, in its findings regarding division of marital assets, the trial court found "Neither [Wife] nor [Husband] received inherited assets or received gifts of significant value during the course of their marriage." (*Id.* at 160.) In a footnote to that finding, the trial court provided "The court's determination that [Wife] did not dissipate the assets of the marital estate by her waiver of her share of her father's estate eliminates any reason to reference that inheritance in this finding." (*Id.* at 161 n. 4.)

Husband asserted in his motion to correct error that the trial court's judgment was erroneous because Husband had argued not that Wife had dissipated assets but that she had disposed of assets. (*Id.* at 175.) The trial denied this portion of Husband's motion, stating that it "recognizes the alternative theory argued by [Husband] but finds no error in the decree." (*Id.* at 191.)

"Dissipation of marital assets involves 'the frivolous, unjustified spending of marital assets' and 'includes the concealment and misuse of marital property.'" *Newby v. Newby*, 734 N.E.2d 663, 667 (Ind.Ct.App.2000) (quoting *In re Coyle*, 671 N.E.2d 938, 943 (Ind.Ct.App.1996)). To determine whether dissipation of assets occurred, a court must determine whether assets were actually misused or wasted. *Goodman*, 754 N.E.2d at 598.

Disposition of marital assets, on the other hand, refers "not to transfers or transactions that are wasteful, foolish or frivolous but to those that are unusual or out of the ordinary." *Coyle*, 671 N.E.2d at 944. We have held that disposition and dissipation of assets must have distinct meanings, otherwise the inclusion of one of the terms in the statute would be superfluous. *Id.* If one party disposes of marital property in an unusual or extraordinary manner, then the presumption of equal division of property can be rebutted. *Id.*

At trial, Wife testified about the inheritance from her father:

Q At some point in time [Wife] did, for the court record what was your father's name?

A Fren (phonetic) Hanania.

Q At some point in time did you waive any interest, which you may have had in land in the Middle East?

A Yes.

Q All right. And do you recall approximately when that was?

A Yes.

Q When?

A April of 1995.

Q Do you remember the circumstances of how it came about that you signed that waiver in 1995?

A Yes.

Q And what were those circumstances?

A The document was presented to me by my mother, I believe. I was living in Indianapolis at the time, and I signed the document.

Q Do you remember how you obtained it?

A Not exactly. Not specifically seeing how my family was, they gave it to me and they were in Michigan and I

was living in Indianapolis. I'm sure they gave it to me somehow. I don't remember the specifics.

Q All right. Let me ask you this [Wife] . . . Prior to the time that the two of you married did you have discussions with your husband about your father's land in the Middle East?

A Yes.

Q And what did your discussions consist of?

A Basically that there was property that my father owned in the Middle East and that the tradition was that the land was to be passed down from generation, from son to son from generation to generation.

Q Did your husband object to you at any point in time about that, about you following that tradition?

A No.

Q After your father passed away did you again discuss with him this tradition?

A Yes.

Q And at that time, any time between the time your father passed away and when you signed the release in 1995 did he voice to you a, an objection?

A No.

(Tr. at 438–40.)

In addition, Wife's mother testified at trial that, to her knowledge, Husband had never objected to Wife's execution of the waiver. In fact, to the contrary, Husband's brother testified that he and Husband had discussed the waiver on many occasions and that, once the matter was settled, Husband said that he was happy that it was over, that he did not want any interest in the land, and that "I own her and I don't have to deal with this anymore." (*Id.* at 356.) Husband's brother

testified that Husband's family followed the same tradition.

Despite the fact that Husband did not object to Wife's waiver of her inheritance, Husband claims that the waiver of inheritance "disposed of property which would have enriched the marital estate" and "deprived the marital estate of about $3 million." (Cross–Appellant's Reply Br. at 14.) Accordingly, in Husband's opinion, Wife should have received a smaller percentage of the marital estate.

We have no doubt that Wife's waiver of inheritance deprived the estate of an asset and disposed of property that would have enriched the estate. Nevertheless, the question is whether the trial court abused its discretion in failing to interpret that waiver as a disposition of assets that would be held against Wife under Ind.Code § 31–15–7–5.

 When a trial court is determining whether an inappropriate dissipation of assets has occurred, the court should consider the following factors:

1. Whether the expenditure benefited the marriage or was made for a purpose entirely unrelated to the marriage;

2. The timing of the transaction;

3. Whether the expenditure was excessive or de minimis; and

4. Whether the dissipating party intended to hide, deplete, or divert the marital asset.

*Goodman,* 754 N.E.2d at 598 (quoting *Coyle,* 671 N.E.2d at 943). Dissipation cannot be determined from the application of just one of these factors, as "proper inquiry requires the trial court to weigh the various considerations." *Bertholet v. Bertholet,* 725 N.E.2d 487, 499 (Ind.Ct. App.2000). If a party's intent was to hide, deplete or divert marital assets, that intent is relevant to the trial court's determina-

tion of dissipation. *Id.* However, if the non-dissipating party consented to the expenditure, a court should be less likely to find dissipation. *Id.* Finally, "transactions which are remote in time and effect, and where many years of marriage have intervened, may be deemed insignificant, while transactions which occur during the breakdown of the marriage, just prior to filing a petition or during the pendency of an action, may require heightened scrutiny." *Id.* (quoting *Coyle,* 671 N.E.2d at 943). We see no reason why similar factors and factual circumstances should not guide the trial court's determination of whether an improper disposition of assets occurred.

Wife waived her inheritance in 1995, some four years before the parties separated, which suggests that she was not diverting assets from the marriage in anticipation of divorce and division of assets. Husband approved of Wife's waiver of her inheritance at the time that it occurred. In fact, Husband did not want to inherit the land and was happy when the matter was resolved. Given these facts, we cannot say that the trial court erred by finding Wife had not disposed of marital assets in such a manner to justify the application of Ind.Code § 31–15–7–5.

### 4. *Conditional Custody*

Wife claims that the trial court erred when it conditioned her custody of the parties' children on her continuing to reside in Allen County. Child custody determinations lie within the sound discretion of the trial court. *Klotz v. Klotz,* 747 N.E.2d 1187, 1189 (Ind.Ct.App.2001). We will reverse the trial court's decision only if it manifestly abused its discretion. *Id.* An abuse of discretion occurred if the trial court's decision was clearly against the logic and effect of the facts and circumstances, or reasonable inferences therefrom, that were before the court. *Id.*

Where, as here, the trial court entered findings to support its custody determination, our review has two levels. *Fields v. Fields,* 749 N.E.2d 100, 108 (Ind. Ct.App.2001), *trans. denied.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We will not reverse unless the findings or judgment are clearly erroneous. *Id.* Findings are clearly erroneous if they are unsupported by evidence, or reasonable inferences therefrom, found in the record. *Id.* A judgment is clearly erroneous if it is unsupported by the findings and conclusions. *Id.*

The trial court's order regarding child custody was as follows:

> [Wife] is granted custody of the parties' minor children.... The best interest of the children are served by requiring that they remain in the Allen County, Indiana community. Accordingly, the grant of custody of the parties' minor children is subject to maintaining their residence in Allen County, Indiana. In the event [Wife] decides to relocate outside Allen County, Indiana, without the agreement of [Husband] or further order of this court, custody of the children shall be granted to [Husband].

(Appellant's App. at 164.) Wife claims this order was erroneous for a number of reasons. We address each argument separately.

### A. *Prospective Order in Violation of Statute?*

Wife claims the trial court's order violates the Indiana statute that controls modification of custody because it is a prospective order that provides for a future change of custody without an analysis of what would be in the children's best interests. We review pure questions of law raised on appeal under a de novo

standard. *Bader v. Johnson,* 732 N.E.2d 1212, 1216 (Ind.2000). De novo review permits us to decide an issue without giving any deference to the trial court's decision. *Id.* A pure question of law "requires neither reference to extrinsic evidence, the drawing of inferences therefrom, nor the consideration of credibility questions for its resolution." *Id.* (quoting 4A Kenneth M. Stroud, Indiana Practice § 12.3 at 134 (2d ed.1990)).

Wife claims the following language is prospective: "In the event [Wife] decides to relocate outside Allen County, Indiana, without the agreement of [Husband] or further order of this court, custody of the children shall be granted to [Husband]." (Appellant's App. at 164.) Husband argues that language is not a prospective order:

> [T]he potential change in custody in this case upon the future relocation of [Wife] will not operate automatically without a decision from the trial court. Rather, the order of the trial court states simply that if [Wife] decides (present tense) to relocate, "custody of the children shall be *granted* to [Husband]." (App. at 164 (emphasis added).)

(Appellee/Cross–Appellant's Br. at 18.)

Contrary to Husband's argument, the trial court's order can be read to indicate either present or future application. To have only a present impact, the trial court's order would have had to read something like: "If Wife is staying in Allen County, then custody of the children is granted to Wife. However, if Wife is moving to Michigan, then custody of the children is granted to Husband." Rather than explicitly using present tense, the trial court's order provides that custody "shall be granted" to Husband if Wife "decides to relocate," which can be read to indicate that custody automatically would shift to Husband if Wife decides to relocate at any time in the future. Wife asserts we should reverse the trial court's order because it could be used to enact an automatic change of custody at some point in the future.

■■■ We begin by noting that the procedure established by Ind.Code § 31–17–2–23 will almost always result in a "prospective" order. As Judge Shields noted in her dissenting opinion in *Hoos v. Hoos,* 562 N.E.2d 1292, 1296 (Ind.Ct.App.1990):

> [T]he procedure contemplated in IC 31–1–11.5–21 [predecessor of I.C. § 31–17–2–23] is unique in that it necessarily results in an advisory opinion. If the relocation notice prompts the noncustodial parent to file a petition to modify based upon the stated relocation, the issue litigated is whether the relocation constitutes such a continuing and substantial change in circumstances as to render the existing order unreasonable. If the answer is yes, the statute contemplates the trial court's judgment will be that if the stated relocation occurs, custody will be modified; if it does not, custody will remain unchanged.

Consequently, to some extent, the prospective wording of the trial court's order is inevitable and does not cause us to reverse the trial court's order.[2]

2. The trial court found support for its decision to include such language in *Hanks v. Arnold,* 674 N.E.2d 1005 (Ind.Ct.App.1996). There, the trial court ordered "custody of [the child] would remain with [mother] unless she moved to Wyoming, whereupon, [father] would become the custodial parent." *Id.* at 1007. The mother appealed, questioning whether the facts supported the trial court's modification of custody if mother moved to Wyoming. *Id.* at 1007–08. We held that the trial court's findings supported its decision to change custody to the father if the mother moved out of state. *Id.* at 1009. Because the appellant in *Hanks* did not question whether the order was an impermissible prospective

Nevertheless, Wife argues that the prospective wording violates I.C. § 31–17–2–21 because it allows custody of the children to be modified at some unspecified time in the future without the trial court having to make a determination about whether a substantial change has occurred and whether a modification would be in the children's best interests. That code section provides:

(a) The court may not modify a child custody order unless:

(1) the modification is in the best interests of the child; and

(2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 and, if applicable, section 8.5 of this chapter.

(b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.

(c) The court shall not hear evidence on a matter occurring before the last custody proceeding between the parties unless the matter relates to a change in the factors relating to the best interests of the child as described by section 8 and, if applicable, section 8.5 of this chapter.

Ind.Code § 31–17–2–21. Under this section, a trial court may not modify custody until it determines whether a substantial change has occurred and whether a modification is in the child's best interests. *Mundon v. Mundon,* 703 N.E.2d 1130, 1135 (Ind.Ct.App.1999). In fact, in *Mundon,* we held that implementation of an automatic

change without consideration of the statutory factors was reversible error. *Id.*

Consequently, if the language at issue in the trial court's dissolution order were applied in the future to enact an automatic change in custody of the children, such a change would probably violate the statute per *Mundon.* However, as the order has not been applied in such a manner, that question is not before us today, and we need not invalidate the trial court's order on that ground.[3]

Rather, we interpret the order to be only a current denial of Wife's petition to move the children to Livonia. Such order is not erroneous if it is supported by sufficient findings. We address the sufficiency issue below.

B. *Allen County vs. 100–Miles*

Next, Wife claims that the trial court's custody order was erroneous because it required her to stay in Allen County when any other custodial parent would be permitted to move within Indiana up to 100 miles from his or her ex-spouse without notifying the court. Because this issue is a question of law, we review it de novo. *Bader,* 732 N.E.2d at 1216.

Ind.Code § 31–17–2–23 provides, in pertinent part:

(a) If an individual who has been awarded custody of a child under this chapter intends to move to a residence:

(1) other than a residence specified in the custody order; and

___

order, that opinion does not control the outcome here. Nevertheless, it indicates these orders are typically written in prospective language.

**3.** Nevertheless, we note that if, at some as yet undetermined time in the future, Wife decides to move to Michigan, or any other location outside the state of Indiana or at least 100

miles from Allen County, she should file another notice of intent to move pursuant to Ind.Code § 31–17–2–23(a). Thereafter, if Husband files a motion pursuant to Ind.Code § 31–17–2–23(b), we presume the trial court would make the determination required by Ind.Code § 31–17–2–21 and *Mundon.*

(2) that is outside Indiana or at least one hundred (100) miles from the individual's county of residence;

the individual must file a notice of the intent to move with the clerk of the court that issued the custody order and send a copy of the notice to a parent who was not awarded custody and who has been granted visitation rights under IC 31–17–4 (or IC 31–1–11.5–24 before its repeal).

Neither party cited any controlling authority on this issue.[4] However, we addressed a similar issue in *Hoos v. Hoos,* 562 N.E.2d 1292 (Ind.Ct.App.1990). In *Hoos,* a custodial mother filed a notice of intent to relocate to California with her new husband. The father filed a petition to modify custody. After a hearing, the trial court denied mother's petition to relocate, denied father's petition to change custody, and modified the existing custody order to provide "the mother's custodial rights [are] continued subject to the condition that she reside within 100 miles of LaPorte County, absent a further order of the court." *Id.* at 1293. Mother appealed, claiming the trial court abused its discretion in entering this order. *Id.*

Regarding the 100 mile restriction, we held:

The mother suffered no prejudice from this modification since it actually gives her more latitude than IC 31–1–11.5–21.1 [predecessor of I.C. § 31–17–2–23], which requires notice and opportunity for hearing if a custodial parent desires to move either outside of Indiana or more than a hundred miles away from the existing county of residence.

*Id.* at 1295.[5]

The restriction herein prohibited Wife from moving outside of Allen County. Clearly, that requirement is more restrictive than the requirements for notice provided by Ind.Code § 31–17–2–23. Consequently, we find this case distinguishable from the facts in *Hoos* and hold that the restriction placed on Wife was erroneous.

### C. Burden of Proof

The trial court concluded that "[Wife] bears the burden of demonstrating that the best interests of the children are served by permitting her to relocate with

---

4. Husband cited two cases from New York; however, as he has not demonstrated that those decisions were made under a statutory scheme containing language similar to ours, we decline to follow them. Rather, we interpret the statutory language provided by our legislature.

5. In a vigorous dissent, Judge Shields argued the restriction was unlawful even though it provided more latitude than the statute:

It should be emphasized [I.C. § 31–17–2–23] limits the issue before the trial court to the stated relocation. Therefore, any general restriction on relocation, such as the one here, is contrary to law because it is outside the litigable issues. Further, it contravenes the legislative policy in IC 31–1–11.5–21.1 that a custodial parent who intends to relocate need only file notice of an intent to relocate and not a petition to modify. In other words, under the statute the responsibility to petition for a change of custody is unchanged, it continues to rest with the noncustodial parent. Thus, the restriction on Mother's relocation is contrary to law because the restriction which prohibits Mother from moving 100 miles or more from LaPorte County without petitioning the court to modify the custody order requires her, rather than Father, to petition for a modification in the event of a future proposed relocation. Thus, in the future Mother will have the burden of proving a change in circumstances so substantial and continuing as to render the limiting condition in the existing order unreasonable. This result also contravenes the legislative policy that a custodial parent need only give notice of intent to relocate his or her residence and requires the noncustodial parent to file a petition to modify custody. *Hoos,* 562 N.E.2d at 1296–97.

them to Livonia, Michigan." (Appellant's App. at 161.) Wife claims that this conclusion indicates that the trial court placed an inappropriate burden of proof on her. To support her argument, Wife cites *Swonder v. Swonder*, 642 N.E.2d 1376 (Ind.Ct.App. 1994).

Wife is correct that in *Swonder*, we wrote:

> When a custodial parent intends to relocate outside the state of Indiana, he or she must file a notice of intent pursuant to I.C. 31–1–11.5–21.1 [predecessor of IC 31–17–2–23]. *The statute imposes no burden of proof on the party intending to relocate*, and was not enacted to punish parents who move, but to provide a means for modifying visitation and support orders which would be made unreasonable because of a long distance move by the custodial parent.

*Id.* at 1380 (internal citations omitted; emphasis added).

Nevertheless, in that opinion we also wrote: "I.C. 31–1–11.5–21.1 [predecessor of IC 31–17–2–23] must be construed in conjunction with I.C. 31–1–11.5–22(d) [predecessor of IC 31–17–2–21] which requires the noncustodial parent to show a change in circumstances so substantial and continuing as to make the existing custody order unreasonable before custody may be modified." *Id.* We further explained the burden of proof in custody modifications:

> In a petition to modify custody, the noncustodial parent bears the burden of overcoming the custodial parent's right to continued custody and must make a showing of a decisive change of conditions in the custodial home or a change in the treatment of the children in the custodial home which necessitates removal. This change must be of a decisive, substantial, and continuing nature. The trial court judge must consider the evidence with the best interest of the children uppermost in his or her mind as the paramount concern. It is the effect upon the children which renders any particular change substantial or inconsequential. Thus, the changed circumstances warranting modification must be of a decisive nature, and such circumstances will support a modification order only if the modification is necessary for the welfare of the children involved, thereby conclusively establishing that the existing custody order is unreasonable.

*Id.*

As Wife acknowledges, her situation is different from the situation in *Swonder*. She is not in the midst of a custody modification; she is engaged in an initial determination of custody. At an initial custody determination,

> [t]he court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there is no presumption favoring either parent. The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parent or parents;
> >
> > (B) the child's sibling; and
> >
> > (C) any other person who may significantly affect the child's best interests.
>
> (5) The child's adjustment to the child's:
>
> > (A) home;
> >
> > (B) school; and
> >
> > (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

Ind.Code § 31–17–2–8. As that statute clearly sets out, at an initial determination of custody the trial court is concerned only with the best interests of the child and there is no presumption in favor of either parent.

Wife claims it is "anomalous to place the burden of proof on [Wife] under these circumstances when she would not have such a burden if she had filed her notice post-dissolution." (Appellant's Br. at 37.) However, given the differences in the factors the trial court must consider when making these two types of decisions, it is not anomalous for a party to have a different burden of proof in the two types of proceedings. *See Klotz*, 747 N.E.2d at 1191 (holding that requests to relocate with a child prior to an initial determination of custody are not decided under the same standard as requests to relocate after an initial determination of custody, because Ind.Code § 31–17–2–23 is not implicated when a request is made before an initial determination of custody).

### D. *Sufficiency of Evidence*

■ Wife also argues that "refusing to allow [Wife's] relocation is contrary to the uncontroverted evidence of [Husband's] abuse and the suitability of Livonia." (Appellant's Br. at 27.) As we explained above, the question before us is not whether the trial court erred in denying Wife's request to relocate under Ind.Code § 31–17–2–23, because the trial court was making an initial determination of custody. *See Klotz*, 747 N.E.2d at 1191. Rather, the question is whether it was in the children's best interests to live in Livonia or stay closer to their father.

The trial court made the following findings that support its decision that the children should not be moved to Michigan:

7. Both parties love and care for the children.

8. The children are emotionally healthy. They are intelligent, resilient, confident, and well adjusted. Both parents have positively contributed to their emotional health.

\* \* \* \* \*

10. Both parties are appropriate and able to serve as the custodial parent of the children.

\* \* \* \* \*

12. Both parents have been active in the care of the children.

\* \* \* \* \*

15. The continued involvement by the [Husband] in the decisions regarding the medical care of the children will aid in assuring their greatest level of care.

\* \* \* \* \*

18. The doctors who have regularly cared for the children are located in Allen County, Indiana.

19. It is unclear whether the [Husband's] medical insurance coverage will extend to the children should they be relocated to Michigan.

\* \* \* \* \*

35. The children have a close and positive relationship with their paternal grandparents and aunt [who live in Fort Wayne]. . . .

36. Except for a period from November, 1999 to February, 2000, the children have resided in Allen County, Indiana since birth and the parties' eldest son, D.G.B., has been attending Oakview Elementary School in the Northwest Allen County School District.

\* \* \* \* \*

39. The communities of Livonia, Michigan and Allen County, Indiana offer opportunities for athletics and arts, festivals, parks and museums. The court does not find that such resources and youth development opportunities are greater in one community over the other.

\* \* \* \* \*

45. ... [Wife's] family is not without sufficient financial resources to regularly travel to Indiana and no physical barriers to visitation by the extended family were made evident at trial.

46. Livonia, Michigan ... is approximately one hundred sixty (160) miles from [Husband's] residence. The distance requires two and one-half (2½) hours travel time by automobile from Allen County, Indiana.

\* \* \* \* \*

53. Despite the foregoing accusations of domestic violence, [Husband] has been a caring and nurturing father and poses no risk to the children when they are in his care.

\* \* \* \* \*

59. Dr. Robert TenEyc, a clinical psychologist licensed in Indiana completed a custody evaluation of the parties and the children. The evaluation is regarded as a forensic assessment rather than a psychological evaluation. He concluded that the best interests of the children are served by continuing them in the primary care of their mother. However, he also concluded that the children should not be removed from the Fort Wayne, Indiana area.

\* \* \* \* \*

62. Despite his recommendations for custody and relocation, Dr. Akerman did not recommend that [Husband's] contact with the children be limited or supervised. The visitation proposal suggested by him—called the Akerman plan—includes parenting times for [Husband] during two-thirds (2/3) of school vacations, including summers and during all extended weekends. The court finds that Dr. Akerman's recommendation for this level of contact tends to belie the assertion that the children must be separated from the role model of domestic violence. In addition, Dr. Akerman's conclusion that the children's adjustment would be better if separated from [Husband] is not supported by the parties' factual acknowledgment that the children are, at present, well adjusted and emotionally healthy despite the past episodes of violence and the presence of both parents in the same community.

(Appellant's App. at 151–55.)

Based upon those findings, the trial court concluded:

4. [Wife] has the financial means and ability to maintain regular and frequent contact with her family in Livonia, Michigan. The regular telephonic

and computer (Internet) access that she promoted as a means to maintain the children's bond with their father is better employed to serve that purpose with her family.

5. The factual circumstances of this case belie the assertion that [Wife] cannot effectively parent in the shadow of [Husband] in this community. The circumstances and basis by which the court makes this conclusion include but are not limited to the fact that the children are well adjusted and that the experts disagreed as to whether [Wife] should be permitted to relocate from the state with the children. In addition, [Wife] has not demonstrated by her actions that she is now intimidated by [Husband]:

a. She was willing to withhold her agreement to sell the marital home and use it as a bargaining point to gain [Husband's] agreement for her to move to Michigan.

b. The episodes of domestic violence have not repeated since [Husband] sought counseling.

c. [Husband] has exercised regular parenting time without any incident that has placed [Wife] at risk.

d. [Wife] has not identified any episode wherein fear of retaliation or physical violence has rendered her unable to care for the children or prepare for her future.

e. [Wife] has stated she would reconcile if [Husband] would have relocated to Michigan.

6. The children need regular, consistent, and quality contact with their father.

7. The best interests of the children are served by granting [Wife] custody of the parties' minor children so long as the residence remains in Allen County, Indiana.

(*Id.* at 161–62.)

Wife claims that the trial court incorrectly concluded that she is not now intimidated by Husband. In addition, she argues that the trial court's judgment is erroneous because Husband was abusive of Wife, because Livonia is a wonderful place to live, and because she had a job offer there. Assuming arguendo all of those things are true, the trial court's judgment still would not be erroneous because a number of the trial court's findings support its judgment. The numerous findings that Husband is a caring, nurturing, and active father support the trial court's judgment that it is in the children's best interests not to move 2 1/2 hours away from Husband. Accordingly, we affirm the trial court's denial of Wife's request to move the children to Livonia.

### E. *Conclusion*

In summary, because the parties stipulated that the children's best interests were served by granting custody to Wife, we affirm the trial court's grant of custody. Because the evidence is sufficient to support the denial of Wife's relocation petition, we affirm the trial court's denial of Wife's petition to move the children to Livonia. However, because a restriction to Allen County violates Ind.Code § 31–17–2–23, we reverse the trial court's requirement that Wife stay in Allen County with the children.

### 5. *Child Support*

 Finally, Wife claims the trial court erred in determining child support. On appeal, we disturb a trial court's child support order only when it is clearly erroneous. *Macher,* 746 N.E.2d at 127. Factual findings are not clearly erroneous unless the evidence contains no facts or reasonable inferences therefrom to sup-

port the findings. *Id.* We may not reweigh the evidence or assess the credibility of the witnesses. *Glover v. Torrence,* 723 N.E.2d 924, 936 (Ind.Ct.App.2000). Moreover, we may consider only the facts and inferences favorable to the trial court's decision. *Id.*

 Child support orders are to be made in compliance with the Indiana Child Support Rules and Guidelines. *Macher,* 746 N.E.2d at 127. The intent of the framers of the Guidelines was to set up a model by which children would "receive the same portion of parental income after a dissolution that they would have received if the family remained intact." *Glover,* 723 N.E.2d at 936. A calculation of child support made under the Guidelines is presumptively valid. *Id.* A trial court may deviate from the Guidelines only if the court provides written findings to justify the deviation. *Clark v. Madden,* 725 N.E.2d 100, 107 (Ind.Ct.App.2000). Nevertheless, "[j]udges are advised to avoid the pitfall of blind adherence to the computation of support without giving careful consideration to the variables that require changing the result in order to do justice." *Glover,* 723 N.E.2d at 936.

Wife claims that the trial court erred in three respects in its child support determination. First, Wife argues the trial court's findings are insufficient to support its ultimate judgment because the findings are inconsistent and because the trial court did not include a child support worksheet with the order. Second, Wife argues the court abused its discretion when it imputed to Wife an income of $35,000. Third, Wife claims that the trial court erred when it reduced Husband's support obligation by 20.67% because of his higher tax bracket. We address each argument separately.

### A. *Insufficient Findings*

 First, Wife argues that the trial court's findings are inconsistent and that the trial court erred by not including a child support worksheet with the order.

Wife claims the trial court's order is inconsistent because two findings provide different support obligations for Husband. Finding 85 provides "[Husband] has a support obligation of $696.00 per week." (Appellant's App. at 157.) Finding 86 indicates that Husband's support obligation is "$537.00 per week." (*Id.*) Husband argues the trial court's reference in Finding 85 to $696.00 was simply a reference to the "child support obligation then in effect at the time of the decree, dating from the trial court's order of February 2, 2000. (App. at 25.)." (Appellee/Cross Appellant's Br. at 37.) However, the trial court's order from February 2, 2000 indicates that Husband's support obligation was "679.73 per week," not $696. (Appellant's App. at 25.) Consequently, it is not apparent why the trial court found that Husband's support obligation was $696. Nevertheless, as the trial court's conclusion indicates Husband must pay $537 per week in support and as the trial court orders Husband to pay $537 per week to the clerk of the court, the erroneous statement in Finding 85 is harmless error for which we will not reverse the trial court's judgment. *See* Ind. Appellate Rule 66(A) (providing appellate court will not reverse for harmless error).

 Wife also asserts the trial court should have included a worksheet with the order. However, we have previously noted:

> We cannot review a support order to determine if it complies with the guidelines unless the order reveals the basis for the amount awarded. Such revelation could be accomplished either by specific findings or by incorporation of a proper worksheet.

*Cobb v. Cobb,* 588 N.E.2d 571, 574 (Ind.Ct. App.1992). Consequently, the trial court was not required to include a worksheet in its order as long as its findings were sufficient to explain how it arrived at the support obligation.

The trial court's findings do not reveal the basis for its decision. The trial court found that Husband's total "gross income is $361,000.00 per year or the sum of $6,942.00 per week." (Appellant's App. at 156.) The trial court imputed income to Wife at "$35,000.00 per year." (*Id.* at 157.) The trial court's next finding indicates that Husband's support obligation, before deductions for visitation and higher taxes, is "$752.00." (*Id.*) The trial court's findings are not sufficient to indicate how the trial court determined Husband's obligation is $752.00. In fact, because the trial court did not include a finding regarding the cost of work-related child care, when we applied the formula for calculating support when parties have income in excess of the Guideline Schedules to the parties' incomes, we did not arrive at the $752.00 value the trial court computed.

Nevertheless, Husband points out that the trial court was following one of his worksheets. (*See id.* at 113.) Because all of the trial court's findings match the values on Husband's worksheet, we may determine how the trial court reached its finding that Husband's obligation was $752 before deductions for visitation and higher taxes. Consequently, we need not reverse for the trial court's failure to include sufficient findings to support the judgment.[6] *See* App. R. 66(A).

### B. *Imputed Income*

Next, Wife argues that the trial court abused its discretion when it imputed $35,000 income to her. The Child Support Guidelines provide that if a parent is voluntarily under-employed, the trial court must calculate child support by determining the parent's potential income. *Clark,* 725 N.E.2d at 107. "Potential income is to be determined upon the basis of the work history, occupational qualifications, prevailing job opportunities, and earning levels in the community." *Id.* The purposes for including potential income are to "discourage a parent from taking a lower paying job to avoid the payment of significant support" and to "fairly allocate the support obligation when one parent remarries, and because of the income of the new spouse, chooses not to be employed." Child Supp. G. 3, cmt. 2c. The trial court enjoys broad discretion to impute income to a parent so that the parent cannot evade a support obligation. *Glover,* 723 N.E.2d at 936.

The trial court imputed $35,000.00 income to Wife. The trial court's findings related to Wife's possibilities for employment were:

31. Since their marriage and to the present, [Wife] has not been employed; the parties having agreed that she would apply her talents and time to the children and homemaking responsibilities.

32. During the marriage she earned her baccalaureate degree in general studies. Prior to the marriage she worked as a beautician.

33. [Wife] has been offered a position as an assistant dietician with the Health Center owned by North-Pointe Heart Center in Berkley, Michigan. If she relocates and ac-

6. Nevertheless, we advise the trial court to include more extensive findings in future orders to eliminate such problems. If the trial court chooses not to attach its own worksheet, and instead relies on one of the parties' worksheets, the court could clarify matters by incorporating the party's worksheet by reference.

cepts the position she would receive an annual salary of $35,000.00 plus benefits. If she secures a masters degree as a dietician, she would have the ability to earn as much as $55,000.00 per year. She has not found a similar paying position in Allen County, Indiana. However, her job search in that community has been limited.

(Appellant's App. at 152.)

Wife claims the evidence was insufficient to support the trial court's finding that her job search in Allen County had been limited and that, therefore, the findings were insufficient to support the trial court assigning her a potential income value of $35,000.

At trial, Wife testified about her job search in Allen County:

Q All right. Now did you [Wife] attempt to find out if there was similar, if there were similar positions [as a dietician's assistant making $35,000 per year] in Fort Wayne?

A Yes.

Q And what did you do to try to find that out?

A I called St. Joseph's Hospital to see if they had a program that which [sic] I would be working at and they don't have any program like that. I called Lutheran Hospital to find out if they had a program like that. They have a weight management program at Lutheran, but they, but its encompassed within their hospital and they only hire dieticians. They are not currently hiring and they only hire dieticians, not DA's. And that's at Lutheran.

Q What's a DA?

A Dietician's Assistance [sic].

Q Okay. All right. And did you determine whether there were perhaps other employment opportunities in Fort Wayne for which you have had some experience?

A Yes.

Q And what did you look into?

A I contacted the weight loss clinics or centers around town, such as Jenny Craig, Summit Weight Loss and LA Weight Loss, or LA Express Weight Loss.

Q And were you ... able to determine whether those were viable options for you?

A Yes.

Q And what did you determine?

A Well, Summit was currently not, not in the near future were hiring. And Jenny Craig was not either currently. But they had told me that that was a minimum wage position, no benefits, you receive I think two percent, one to two percent on commission sales. So it's a lot of, it's a sale area job. And the hours, you know, may or may not be as flexible. I contacted LA Weight Loss or LA Express and they had said that they were opening a new facility that they may be in the area of hiring, but again it was more of a sales area where you would be selling their program and selling their services, basically. And again, its [sic] minimum wage, no benefits and, you know, the hours. It's a center so they're open from nine to nine, I believe, so the hours may not be as flexible.

Q All right. Do any of these places Summit, Jenny Craig, or LA Weight Loss Express have to your knowledge a benefit package that would be anything close to the Northpointe Center?

A No, they do not.

Q You have had some experience, I believe, you testified earlier in hair-dressing?

A Yes.

Q And how long ago was that experience?

A 1986. So that would be fifteen years ago.

\* \* \* \* \*

Q Okay. Did you determine whether the hairdressing position in the Fort Wayne area is a viable option for you?

A Yes.

Q What did you determine?

A I determine [sic] that they, most shops do it by a booth rental system where you are a self-practitioner or you are self-employed so to speak, and you rent booth space from the owner of the shop. And so you pay them a monthly rent or a fee and you pay that out, not guaranteeing that anything will come in, certainly until you've established a clientele basis or you've built up your clientele. And also that the industry has certainly changed over, you know, that many years and I would need some additional courses in hair coloring or perming or cutting or styling or whatever. To kind of acclimate me into the industry.

(Tr. at 528–32.) Wife claims that Husband did not present any evidence regarding possibilities for employment for her, and Husband has not directed us to any such evidence. Consequently, we presume there is no other relevant testimony on Wife's job search.

We agree with Wife that her testimony indicates that she looked in Allen County for employment similar to the opportunity in Livonia, but that no such employment was available. However, the only other type of work that Wife investigated was employment as a hairdresser. Given that dietetics and hairdressing are only two of many possible professional options, we cannot say that the trial court's characterization of Wife's search as "limited" was an abuse of discretion. Therefore, we affirm the trial court's finding that imputed $35,000 income to Wife.

### C. *Reduction for Taxes*

Finally, Wife claims that the trial court erred when it reduced Husband's support obligation based upon his higher tax bracket. Wife does not argue that the trial court erred by taking Husband's tax rate into consideration. *See* Child Supp. G. 1, cmt. ("[T]axes vary for different individuals.... [W]here taxes vary significantly from the assumed rate of 21.88 percent, a trial court may choose to deviate from the guideline amount where the variance is substantiated by evidence at the support hearing."). Rather, Wife argues 1) the trial court reduced Husband's child support obligation when it should have reduced his gross income and 2) the percentage by which the trial court reduced Husband's obligation was inappropriate.

### 1. *Method*

■ To account for Husband's increased tax rate, the trial court subtracted 20.67% from the support obligation that the trial court had already calculated for Husband. Consequently, the trial court reduced Husband's support obligation by $140.00, from $677.00 to $537.00. Wife claims that the trial court should not have reduced Husband's support obligation; rather, it should have reduced Husband's gross weekly income on line one of the child support obligation worksheet. We agree with Wife.

The commentary to Guideline 3 discusses calculation of the weekly gross income for a person who is self-employed. *See* Child Supp. G. 2a, cmt. That section provides:

The self-employed pay F.I.C.A. tax at twice the rate that is paid by employees. At present rates, the self-employed pay fifteen and thirty one-hundredths percent (15.30%) of their gross income to a designated maximum, while employees pay seven and sixty-five [percent] (7.65%) to the same maximum. The self-employed are therefore permitted to deduct one-half of their F.I.C.A. payment when calculating Weekly Gross Income.

*Id.* Similarly, Husband is paying tax at a rate higher than the 21.88% presumed by the Guidelines. Because he is paying tax at a higher rate, he should be able to reduce his weekly gross income by the portion of his tax rate that exceeds the 21.88% that every other parent is presumed to pay. The trial court erred when it reduced Husband's support obligation rather than his gross weekly income.[7]

### 2. Percentage

■ The Child Support Guidelines presume that each parent pays in taxes 21.88% of his or her income. Child Supp.

G. 1, cmt. If a party produces substantiated evidence that he or she pays a tax rate very different from that presumed rate, the trial court may take that variation into account when calculating child support. *Id.*

■ The trial court found: "Taxes on [Husband]'s income exceed that which is assumed by the state support guidelines. A deviation / adjustment of 20.67% is applied against the support amount calculated in this case." (Appellant's App. at 157.) Wife claims the evidence presented at trial does not support that adjustment rate. We agree.

The evidence presented at trial was that in 2001, Husband paid $137,304 in taxes on $361,000 income. Thus, Husband's actual tax rate was 38.03%. That rate is 16.15% higher than the presumed tax rate of 21.88%. Consequently, the trial court should have reduced Husband's gross income by 16.15% before entering it into line one of the child support worksheet. The trial court's use of 20.67% was erroneous.

---

7. Further support for this result can be found when one considers the impact on a non-custodial parent's child support obligation when a trial court reduces the final obligation rather than the gross income. For example, assume we have a father who makes $7000 a week, a mother who makes $500 a week, three children, and no child care expenses. Following the child support worksheet and the equation for income in excess of the Guideline Schedules, the total support obligation for the two parents is $725. The father would be required to pay $677, and the mother would be required to pay $48. If the father's support obligation is then reduced by 20.67% for excess taxes, his support payment becomes $537. When combined with mother's obligation, the total obligation is $585. According to the Guideline Schedules, $585 is what two parents with three children would be obligated to pay if their combined income was approximately $3250 per week. Subtracting the mother's $500 weekly income,

the father's assumed income level would be $2750 per week. Consequently, reducing a father's support obligation by 20.67% corresponds to decreasing father's income by just over 60%. This cannot be an appropriate result in a system set up to ensure that children "receive the same portion of parental income after a dissolution that they would have received if the family remained intact." *Glover*, 723 N.E.2d at 936.

If, on the other hand, we reduce a father's gross income by 20.67% for the additional taxes he pays, his income becomes $5553. When we combine his income with mother's $500 and run the total income through the equation for income in excess of the Guideline Schedules, the total support obligation is $689. Of that, the father's obligation would be $632, which is $95 per week more than he would pay if his support obligation were reduced by 20.67%. Accordingly, reduction of father's gross income is more appropriate.

### 3. *Calculation*

Because we have all the information required to calculate the child support obligation, we undertake that task rather than remanding for the trial court to calculate the values. *See, e.g., Beeson v. Christian*, 583 N.E.2d 783, 789–90 (Ind.Ct.App. 1991) (correcting a scrivener's error in the trial court's order "[i]n an effort to preserve judicial economy and pursuant to the authority vested in this court by Ind. Appellate Rule 15(N)" [currently Ind.App. Rule 66(C) ] ).

The trial court found Husband's weekly gross income was $6,942.31. Reduced by 16.15% for the additional taxes Husband pays, Husband's weekly gross income is $5,821.13. Imputing $35,000 income to Wife per year, her weekly gross income is $673.08. The parties' combined income is $6,494.21. Husband's share of that total is 89.64%. Wife's share of that total is 10.36%.

The trial court found, and neither party contests, that the work-related child care expense is $100. When we subtract that from the weekly adjusted income, the combined weekly adjusted income is $6,394.21. That amount exceeds the income levels on the Guideline Schedules; therefore, to determine child support, we must solve the following mathematical equation:

$[89.42443 \times \ln(6394.21)] - 411.24 =$ support for one child

Child Supp. G. 3(D), cmt. The support for one child is $372.40. To calculate the support for three children, we multiply the support for one child by 1.875. *Id.* Accordingly, the basic support obligation in this case is $698.25. Adding back in the $100 for work-related child care expense makes the total child support obligation $798.25.

Wife's portion of that obligation is $82.70 (798.25 × .1036). Husband's portion of that obligation is $715.55 (798.25 × .8964). Reducing Husband's obligation by 10% for visitation makes his final obligation $644. We direct the trial court to amend its order to reflect these values.

### CONCLUSION

Husband waived any argument regarding the amount of temporary maintenance he had to pay to Wife during the proceedings by failing to appeal that issue when the interlocutory order was made. We affirm the trial court's partial grant of Husband's motion to correct error, which reimbursed Husband for interest payments made on the house. We affirm the trial court's division of assets. We affirm the trial court's grant of custody to Wife and denial of her request to relocate with the children to Livonia, Michigan; however, we reverse the portion of the trial court's order that requires Wife and the children to live in Allen County and we remand for the court to modify its order to reflect this change. Finally, we reverse the trial court's child support order and remand for the trial court to amend its order to reflect the values calculated herein.

Affirmed in part, reversed and remanded in part.

BROOK, C.J., and FRIEDLANDER, J., concur.