Jason Edward FUCHS, Appellant–Petitioner,

v.

Megan MARTIN, Appellee–Respondent,

and

Cheryl Martin, Appellee–Intervenor.

No. 49A02–0411–JV–936.

Court of Appeals of Indiana.

Nov. 10, 2005.

Roger A. Young, Young & Young, Franklin, IN, Attorney for Appellee Megan Martin.

Melanie K. Reichert, Broyles Kight & Ricafort, LLP, Indianapolis, IN, Attorney for Appellee Cheryl Martin.

## OPINION

MAY, Judge.

Jason Edward Fuchs ("Father") appeals the trial court's judgment in Fuchs' paternity action against Megan Martin ("Mother").[1] Fuchs raises three issues, which we restate as:

1. Whether the award of joint legal custody to Mother and Father, with Mother having sole physical custody, was clearly erroneous;

2. Whether the trial court's calculation of child support was an abuse of discretion because the court reduced Mother's payment obligation by giving her credit for parenting time, when she is the custodial parent; and

3. Whether the trial court's requirement that Mother and Father submit all future disputes to mediation, with one of two mediators named in the order, is contrary to law.

We affirm in part, reverse in part and remand with instructions.

## FACTS AND PROCEDURAL HISTORY [2]

Mother and Father had mutual friends. They met when they were arrested as they

Bryan Lee Ciyou, Ciyou & Dixon, P.C., Indianapolis, IN, Attorney, for Appellant.

---

1. Mother's mother (hereinafter, "Grandmother") filed a motion to intervene in the trial court, which the trial court granted over Father's objection. She filed a brief with us addressing the propriety of the trial court's grant of her motion to intervene. However, Father waived that issue as he did not adequately raise it on appeal. *See infra* note 4.

Nor does her brief respond to the three issues Father argued. Accordingly, Grandmother's brief does not raise any issues we need to address, and we proceed as if Mother and Father are the only parties herein.

2. A Statement of Facts "shall be stated *in accordance with the standard of review appropriate to the judgment or order being appeal-*

and their friends were fleeing a bowling alley where one of their friends had been involved in a fight. Mother and Father began dating and their daughter, T.F., was born January 20, 1999.

On May 11, 2000, Father filed a petition to establish paternity. The court heard the matter on September 1, 2004, and entered the final order on November 1, 2004. That order established paternity in Father, granted joint legal custody to Mother and Father,[3] gave sole physical custody to Mother, ordered parenting time for Father, and established child support. Additional details will be provided where necessary.

## DISCUSSION AND DECISION

▆▆ Because the trial court ·entered findings and conclusions, we apply a two-tiered standard of review. *In re Marriage*

*of Turner,* 785 N.E.2d 259, 263 (Ind.Ct. App.2003). We first determine whether the evidence supports the findings, and then we determine whether the findings support the conclusions. *Id.* We may reverse only if the evidence does not support the findings or the findings do not support the judgment. *Id.* During our review, we may not reweigh the evidence or reassess the credibility of the witnesses. *Id.* Rather, we consider only the evidence favorable to the trial court's judgment. *Id.*

### 1. *Custody* [4]

▆▆ Child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion. *In re Guardianship of B.H.,* 770 N.E.2d 283, 288 (Ind. 2002), *reh'g denied.* Reversal is appropriate only if we find the trial court's decision is against the logic and effect of the facts

---

ed." Ind. Appellate Rule 46(A)(6)(b) (emphasis added). Father appeals the trial court's grant of custody to Mother, a decision we review considering only the facts most favorable to the trial court's decision. *See In re Marriage of Turner,* 785 N.E.2d 259, 263 (Ind. Ct.App.2003). Yet, in Father's Statement of Facts, we cannot find *any* facts favorable to Mother. For reasons not apparent to us, Mother "agrees" with Father's "Statement of the Facts." (Appellee's Br. at 1.) Each party's failure to provide an appropriate Statement of Facts has impeded our review, and we admonish counsel to provide an appropriate Statement in any future appellate briefs.

3. After the Conclusions of Law, the court's order provides: "2. The Mother, Megan Martin[,] shall have primary legal and physical custody of [T.F.]. The parties shall have joint legal custody of [T.F.]." (Appellant's App. at 31.) Father's arguments assume the court granted joint legal custody to Mother and Father. Mother does not challenge his reading of the order. In addition, Finding HH provides, in part: "[T.F.] should be placed in the physical custody of her mother. The parties should have joint legal custody." (Appellant's App. at 29.) Accordingly, we read the inclusion of the word "legal" in the first sentence of paragraph 2 to be merely a scriven-

er's error. The order provides for joint legal custody, with primary physical custody in Mother.

4. "As a subset of this [custody] issue" Father alleges the court erred by granting Grandmother's motion to intervene in the custody dispute. (Appellant's Br. at 6.) However, his argument regarding this "subset" issue consists of two sentences in his Summary of the Argument, (see *id.*), a paragraph in which he is challenging the necessity of one of the court's findings of fact, (*see id.* at 20), and a footnote in which he asserts some of the findings are irrelevant because the court did not make the proper findings to allow Grandmother to intervene. (*See id.* at 13 n. 4.) Nowhere does Father develop the cogent argument, supported by authority and citation to the record, that would permit appellate review of the decision to allow Grandmother to intervene. Accordingly, to the extent he asserts such an issue exists, Father has waived it for appellate review. *See Watson v. Auto Advisors, Inc.,* 822 N.E.2d 1017, 1027–28 (Ind.Ct.App.2005) (citing Ind. Appellate Rule 46(A)(8)(a)), *trans. denied* 831 N.E.2d 749 (Ind.2005).

and circumstances before the court or the reasonable inferences drawn therefrom. *Id.*

The trial court made thirty-four findings of fact. For simplicity, we set out only those findings necessary to support the trial court's decision to order joint legal custody and primary physical custody in Mother.

L. Two psychological experts have been retained to complete custodial evaluations in this case: Dr. Richard Grana and Dr. Lawrence Lennon.... Dr. Grana recommended the continuation of joint physical custody parenting time schedule agreed to in 2001. He also recommended that Mother be designated as the primary physical custodian of [T.F.] and that [T.F.] continue to be cared for by both grandmothers. Dr. Lennon recommended that the Father assume sole physical custody and further suggested that Mother participate in major decisions regarding medical care and education as in joint legal custody. Dr. Lennon based his preference of custodial parent on the more stable financial environment that Father enjoyed and the addition of Jennifer Fuchs, Father's new wife, and their new baby into the family as a positive and loving influence in [T.F.]'s life.

\* \* \* \* \* \*

BB. Should Father be granted sole custody, the evidence before the Court indicates that it is more likely than not that he would engage in a pattern of alienation that would effectively remove Mother from [T.F.]'s life.

\* \* \* \* \* \*

DD. Dr. Grana testified that granting either parent sole custody would validate their prior poor behavior and would severely deteriorate the other parent's relationship with [T.F.].

\* \* \* \* \* \*

FF. Neither parent is completely unfit to have sole custody of [T.F.] as argued by counsel, however both parents must begin to put [T.F.]'s best interest first and develop sound parenting skills. The parents have been operating under a split physical and joint legal custody order since 2001. The parties have been unable to effectively communicate with each other although some progress in that regard has been made in recent months.

\* \* \* \* \* \*

HH. Based on an assessment of potential risks of harm in the respective parents' homes and in order to establish a comfortable and reassuring routine of daily life consistent with her best interests, [T.F.] should be placed in the physical custody of her mother. The parties should have joint legal custody of [T.F.]. Major decisions that concern her health, education and religious upbringing should be decided after consultation and discussion between her biological parents. Father should have parenting time pursuant to the Indiana Parenting Time Guidelines. They should work together to agree on additional parenting time for Father. They should immediately seek to establish a regular routine, which includes regular healthy meals and bedtimes for [T.F.]. Her environ-

ment should include safe and secure supervision in a calm atmosphere. This type of physical custodial climate can best be met in Mother's home at the present.

(Appellant's App. at 22–29.) Those findings are sufficient to support the trial court's ultimate order of joint custody, with Mother having primary physical custody.[5]

Father claims there is no evidence in the record to support the trial court's order, and he questions the validity of many of the trial court's findings. He asserts he "wishes to make clear that he is not asking this Court to re-weigh the evidence, but to reverse in accordance with the only evidence in the record." (Appellant's Br. at 10.) In light of the evidence Mother directs us to in the Transcript and Exhibits, we cannot agree with Father's assertion.

Dr. Grana, who was one of the two custody evaluators in this case, testified:

So that I ended up with the feeling that not much has changed in the sense of their awareness. Their awareness that change begins with them and that they have to demonstrate a willingness to act differently. More cooperatively. More courteously with one another. And so the issue was still, you know, one of custody. And my feeling was that neither one had convinced me that they deserved the role of sole custodial parent. There was still a lot of instability and immaturity ... And I was wanting to continue with some type of liberal visitation because I think that, you

know, I couldn't see a reason why both parents should not be involved with their daughter .... but I was most concerned about trying to build a structure that would help them get through the next bunch of years. And that's why I was recommending some type of mental health intervention. That seemed to me to be more important than the label of custody. So that they could have some avenue for building some type of coparenting structure that would be effective for them. And so that's why I made a recommendation for liberal visitation. No change in custody. And try to get them involved in the mental health system.

(Tr. at 103.) In addition, he noted "high conflict couples will do battle with sole custody just as often as they will with joint custody," (*id.* at 105), and "liberal involvement still is important for [T.F.]." (*Id.*) He was also concerned that giving one parent sole custody would give "the sole custodial parent the belief or endors[e] their belief that the other parent is a bad parent." (*Id.* at 107.) In his report, he recommended "[Mother]'s residence be considered the primary residence for [T.F.]." (Exhibits, Respondent's Exhibit B at 11.) That evidence supports Findings L and DD, and portions of Finding FF.

While Dr. Lennon's report indicated Father should "assume sole custody," (Exhibits, Petitioner's Exhibit 2 at 10), it also "strongly suggested that [Mother] participate in major decisions regarding [T.F.'s] education and medical care." (*Id.*) That

---

5. Father alleges problems with a number of the other findings. For example he claims Finding GG is "irrelevant" and Finding EE has no purpose. (Br. of Appellant at 13 n. 4.) Nevertheless, we need not reverse a court's order because it included superfluous findings. *See Lasater v. Lasater,* 809 N.E.2d 380, 397 (Ind.Ct.App.2004) (stating rule in standard of review). To the extent other of the court's findings may be inaccurate, we need not address those arguments because the findings set out above support the court's conclusions and order. *See Roydes v. Cappy,* 762 N.E.2d 1268, 1276 n. 6 (Ind.Ct.App.2002) (declining to address validity of superfluous findings where other valid findings supported the judgment).

evidence supports the trial court's statements regarding Dr. Lennon in Finding L.

Mother testified:

Q For the year period that you lived with your mom after you left [paternal grandmother's house] right after [T.F.] was born, did [Father] have very much contact with [T.F.] during that period?

A No. It was on and off.

Q And again, at any time during that period, did you keep ... in any way try and keep [Father] away from [T.F.]?

A No.

Q Except that you've testified when you had a concern?

A Well, other than when I felt that ... no, I just wanted to make sure she was safe.

Q And as we sit here today, you have no desire to keep [T.F.] from her father, do you, as long as she's safe?

A Absolutely not.

Q But you do believe that you ... it would be most appropriate for you to have primary physical custody?

A Correct.

Q Is that because you believe you can provide more consistency for [T.F.]?

A Correct.

Q And why is that? I mean, we can say we'll all be more consistent. But why do you think you can be more consistent?

A I've kept her in the same school when he's tried to pull her out. Because she's used to that school. He's taken her to ... I've kept her at the same doctor. I mean, we have a bond together.

Q By the way, are you active in her school activities?

A Yes.

Q When [T.F. is] with you, does she have a set routine?

A Yes.

Q Pardon?

A Yes.

Q And I think you've already described that to the Court. At eight a.m. you take her to school.

A Correct.

Q And your mom picks her up . . . .

\* \* \* \* \* \*

Q Are there any other reasons that you can think of why you believe you would be the appropriate parent to have full custody?

A I just feel that I am more stable and more consistent in her life than he is.

(Tr. at 181–83.) That testimony supports the trial court's finding Mother was best able to provide consistency at this point in time.

Grandmother testified:

Q How often do you provide care for [T.F.]?

A Probably just about every day except for the weekends.

Q What is the current schedule? How often are you providing care for [T.F.]?

A I have [T.F.] on my ... on Monday, Tuesday. Then she goes back with [Father] on Wednesday. And then every other weekend usually [Mother] has [T.F.] on the weekends that she has. And usually ...

\* \* \* \* \* \*

Q Does [Father] have parenting strengths?

A He didn't when I was around him and when [T.F.] was little. I didn't see a lot. But that was his first time being a dad.

Q Has he developed a relationship with her?

A Most of the time all I hear about is grandma and Jennifer. And then her baby brother sometimes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q Does [Mother] have parenting strengths?

A When she had [T.F.], I think she was very young and immature too. And I think she's got good parenting skills. I think they're coming out of her more and more. At the very beginning, I feel like it was between [paternal grandmother] and I that really ... that first year was tough with both these two kids.

&ast; &ast; &ast; &ast; &ast; &ast;

Q Do you think that either one of them should have sole custody of [T.F.]?

A No.

Q Why not?

A I don't feel like [Father] has the time. The way I remember him in the past. He never had time to do anything. Go to the doctor. [Mother] can give him reports. And I think his lawyer got it when we were going to the doctor for her physical. And the doctor man. I mean, he never went to those things. He had no interest in them until he married Jennifer and then he started having a little bit of interest. I mean, [Mother]'s the one that's at the day care or me. And yes, we do do a lot for the teachers.

Q Other than the safety issues, do you have any other concerns with respect to one part[y] or the other being granted sole custody?

A The safety issue is my biggest. And I ... I feel like [Mother] is ... they're denying [Mother] of those mother and daughter times together that Jennifer is trying to take the place of [Mother].

Q Do you have any reason to think that? Any instances that you can cite?

A Well, the earrings. To me, that's a mother and daughter type thing. And even getting your hair cut. [Father] may think it's silly, but it's ... that's something that a mother and daughter does.

Q Do you have any concerns with respect to access to [T.F.] if one party or the other would be granted sole custody?

A I'm afraid that [Father] will delete this side of the family. [Father] ... they're very manipulating and very controlling people. And they will delete this side as much as possible.

Q Do you have any instances to cite to the Court or information you want to give the Court to support your ...

A Like Jennifer was telling [T.F.] ... [T.F.] told me a few weeks ago. Her name is Fuchs. Daddy's name is Fuchs. Bubby's name is Fuchs. Your mommy's name is Martin. This is your family. You know, I ... and at five years old, it's real easy to manipulate a child. We try not to say anything around [T.F.]. She's a very smart little girl. But if she says that that isn't her home. Daddy's going to throw all my toys away. Yes, I believe those things go on.

(Tr. at 215.) That testimony supports Finding BB and portions of Finding HH.

▪ Because the record contains evidence to support the trial court's relevant findings, and because those findings support joint legal custody with Mother hav-

ing primary physical custody, we may not reverse the trial court's custody decision.

### 2. *Child Support*

 We disturb a trial court's child support order only when it is clearly erroneous. *Macher v. Macher*, 746 N.E.2d 120, 127 (Ind.Ct.App.2001). Factual findings are not clearly erroneous unless the evidence contains no facts or reasonable inferences therefrom to support them. *Id.* We neither reweigh the evidence nor assess the credibility of the witnesses. *Glover v. Torrence*, 723 N.E.2d 924, 936 (Ind. Ct.App.2000). Moreover, we may consider only the facts and inferences favorable to the trial court's decision. *Id.*

 Child support orders should comply with the Indiana Child Support Rules and Guidelines. *Macher*, 746 N.E.2d at 127. The Guidelines provide a model by which children "receive the same portion of parental income after a dissolution that they would have received if the family remained intact." *Glover*, 723 N.E.2d at 936. A calculation of child support made under the Guidelines is presumptively valid. *Id.* A trial court may deviate from the Guidelines only if it provides written findings to justify the deviation. *Clark v. Madden*, 725 N.E.2d 100, 107 (Ind.Ct.App.2000). Nevertheless, "[j]udges are advised to avoid the pitfall of blind adherence to the computation of support without giving careful consideration to the variables that require changing the result in order to do justice." *Glover*, 723 N.E.2d at 936.

 The trial court attached a child support worksheet to its order. On line 6, the worksheet indicates Mother's child support obligation is $90.00. In the line 7 adjustments, Mother is given a $36.00 credit for "Parenting Time." Father asserts that credit is inappropriate because the Child Support Guidelines provide a Parenting Time Credit for only the noncustodial parent. We agree.

Ind. Child Support Guideline 3(G)(4) provides:

> 4. *Parenting Time Credit.* The court may grant the noncustodial parent a credit toward his or her weekly child support obligation (Line 6 of Worksheet) based upon the calculation from a Parenting Time Credit Worksheet (See Support Guideline 6 Commentary entitled Parenting Time and Child Support).

Pursuant to the plain language of that Guideline, a parenting time credit is available only to "the noncustodial parent." As the court's order names Mother the custodial parent, she is not entitled to such a credit.

Guideline 6 contains "Additional Commentary" regarding application of the Guidelines. After an analysis of the Support Guidelines and Parenting Time Costs, Guideline 6 explains how to compute a parenting time credit:

> The apportionment of credit for "transferred" and "duplicated" expenses will require a determination of the annual number of overnights of parenting time exercised by the parent who is to pay child support, the use of the standard Child Support Obligation Worksheet, a Parenting Time Table, and a Parenting Time Credit Worksheet.

> \* \* \* \* \* \*

> The Parenting Time Table (Table PT) begins at 52 overnights annually or the equivalent of alternate weekends of parenting time only. If the parenting plan is for fewer overnights because the child is an infant or toddler (Section II A of the Parenting Time Guidelines), the court may consider granting the noncustodial parent an appropriate credit for the expenses incurred when caring for

the child. If the parenting plan is for fewer overnights due to a significant geographical distance between the parties, the court may consider granting an appropriate credit.

\* \* \* \* \* \*

If the parents are using the Parenting Time Guidelines without extending the weeknight period into an overnight, the noncustodial parent will be exercising approximately 98 overnights.

\* \* \* \* \* \*

**Application of Parenting Time Credit.** Parenting Time Credit is not automatic. The court should determine if application of the credit will jeopardize a parent's ability to support the child(ren). If such is the case, the court should consider a deviation from the credit.

The Parenting Time Credit is earned by performing parental obligations as scheduled and is an advancement of weekly credit. The granting of the credit is based on the expectation the parties will comply with a parenting time order.

Because a "Parenting Time Credit Worksheet" was not attached to the "Child Support Obligation Worksheet," we are unable to determine how the trial court arrived at the amount of credit it applied.

However, the trial court did attach a Child Support Obligation Worksheet to its order, so we are able to correct the trial court's error. *See* Ind. Appellate Rule 66(C)(7) ("The Court may, with respect to some or all of the parties or issues, in whole or in part: ... order correction of a judgment or order."); *see also Bojrab v. Bojrab,* 786 N.E.2d 713, 741 (Ind.Ct.App. 2003) (correcting error in child support calculation), *summarily aff'd in relevant part by Bojrab v. Bojrab,* 810 N.E.2d 1008, 1015 (Ind.2004).

According to Line 6 of the Worksheet, Father's obligation is $199.00, and Mother's obligation is $90.00. Father receives the $135.00 adjustment on Line 7 for payment of work-related child care for T.F., which makes his Line 8 child support obligation $64.00. Because Mother is the custodial parent, her obligation of $90.00 is not adjusted. The court should modify its order to reflect the correct amounts in Lines 7 and 8.

### 3. *Mediation*

Finally, Father claims the trial court erred when it included the following paragraph in its order:

10. The parties are first to attempt to settle any further disputes concerning [T.F.] themselves. If they fail to agree, then the parties are ordered to submit future conflicts and parenting disputes to mediation with either Susan Macey or David Rimstidt at Van Winkle Baten & Rimstidt Dispute Resolution, 111 Monument Circle Suite # 402 317–231–6330. The parties are to pay for mediation fees and costs at the rate of 69% for the Father and 31% for Mother. The parties are not to return to court for adjudication of any dispute without first submitting the same to mediation.

(Appellant's App. at 33.) Father asserts the court's order violates public policy, improperly limits the trial court's subject-matter jurisdiction, and violates the Indiana Constitution's provision of access to courts.

Mother claims the court's order "does not prohibit either party from filing such motions with the court as the parties may deem appropriate in the future." (Appellee's Br. at 8.) We disagree with Mother's reading of the court's order.

· The court's order that the parties submit all disagreements to mediation before they may "return to court for adjudication of any dispute" suggests to us the parties are prohibited from filing any matters in the trial court prior to engaging in mediation. We believe that order is improper and unsupported by the local rule Mother cites.

The local rule provides:

**Mandatory Mediation.** Parties must submit all contested final hearing issues requiring two (2) hours or more of court time and all non-contempt post-decree child related issues to mediation prior to presenting the issues to the court for hearing, unless this rule is waived for good cause shown after written request by a party. The court may in its discretion assign matters to mediation at any stage of the proceeding.

Marion Circuit and Superior Court Family Law Rule 2(H). Those family law rules are "in addition to the Marion Circuit and Superior Court Civil Division Rules." Marion Circuit and Superior Court Family Law Rule 1(B). Rule 16.3 of the Civil Division Rules provides: "Parties must submit post-decree child related issues to mediation prior to presenting such issues to the Court for hearing, unless this rule is waived for good cause shown." Marion Circuit and Superior Court Civil Division Rule 16.3(C)(2).

 As both of those local rules make clear, disputes related to child issues post-decree are to be submitted to mediation prior to being submitted to the court "for hearing." Accordingly, the rules were not meant to prohibit a party from filing motions with the court. *See* Marion Circuit and Superior Court Civil Division Rule 16.3(A)(4) ("During the entire mediation process, the lawsuit shall remain on the Courts [sic] docket."). Rather, the rules simply give the trial court authority to order mediation after receiving a petition or motion and prior to holding a hearing. *See* Marion Circuit and Superior Court Civil Division Rule 16.3(A)(6) ("The mediator and the parties shall make a good faith effort to complete the mediation process within sixty (60) days from the date of the Order to engage in mediation."). Because the court's preemptive order of mediation is not supported by the Marion County rules,[6] we must reverse its order.[7]

---

**6.** Nor is the language in the court's order supported by the statute Mother cites. Ind. Code § 31–17–2.4–1 provides: "Whenever the court issues an order under this article, other than an ex parte order, the court shall determine whether the proceeding should be referred to mediation." Section two of that chapter explains: "When a case is ordered to mediation, the case shall be placed on the court docket for final hearing. The mediation process must be completed not later than sixty (60) days after the mediation order is entered." Ind.Code § 31–17–2.4–2. Those statutes suggest the court is to order mediation when it has a live controversy before it—not before a dispute exists.

**7.** We note the trial court also erred when it named the only two mediators the parties could use. Marion Circuit and Superior Court Civil Division Rule 16.3(A)(2) explicitly provides: "Mediator selection shall be governed by A.D.R. Rule 2.4." Alternative Dispute Rule 2.4 explains:

Upon an order referring a case to mediation, the parties may within seven (7) days in a domestic relations case . . . : (1) choose a mediator from the Commission's registry, or (2) agree upon a non-registered mediator, who must be approved by the trial court and who serves with leave of court. In the event a mediator is not selected by agreement, the court will designate three (3) registered mediators from the Commission's registry who are willing to mediate within the Court's district as set out in Admin. R. 3(A). Alternately, each side shall strike the name of one mediator. The side initiating the lawsuit will strike first. The mediator remaining after the striking process will be deemed the selected mediator.

## CONCLUSION

Because the evidence most favorable to the judgment supports the court's order regarding custody of T.F., we affirm the order of joint legal custody, with primary physical custody in Mother. Because the support order provides the custodial parent, Mother, a credit available only to the noncustodial parent, we reverse that credit and remand for the trial court to enter a corrected support order. Finally, we reverse the court's preemptive order for mediation.

Affirmed in part, reversed in part, and remanded with instruction.

KIRSCH, C.J., concurs.

ROBB, J., concurs in result with separate opinion.

ROBB, Judge, concurring in result.

I respectfully concur in the result reached by the majority with respect to reversal of the preemptive mediation provision of the trial court's order. I write separately to address the propriety of the local rule in general.

Trial courts may establish rules for their own governance pursuant to Trial Rule 81 and Indiana Code section 34–8–1–4. These rules are to be supplementary to and not conflict with any statute or supreme court rule. *See* Ind.Code § 34–8–1–4. I agree that alternative dispute resolution is a good idea in many cases; however, I believe the local rule at issue here goes too far in imposing additional, significant restrictions on litigants that are not present in the dissolution statutes. The local rule does provide a "good cause" exception, but "good cause" is not defined and the exception puts an unfair onus on the litigants. The local rule at issue is not merely a procedural rule for the governance of the courts, but restricts the litigants' ability to have their day in court. *See In re Paternity of A.M.C.*, 758 N.E.2d 536, 539–40 (Ind.Ct.App.2001) (holding that local rule which restricted the filing of a petition for modification of custody, support or spousal maintenance unless one year had elapsed from the last order or an extreme emergency is shown was in conflict with modification statute and was unenforceable). I would hold that the local rule is unenforceable on the whole. As the majority reverses that part of the trial court's order regarding mediation in this particular case, however, I concur in the result the majority has reached with respect to this issue.

Moreover, I note, as does the majority, that the trial court abused its discretion in restricting the mediators that the parties could use to those specifically named. Op. at 1059 n. 7. Schedules, costs, and conflicts must be considered when choosing a mediator, and the trial court is no position to assess these conditions prospectively. In addition, pre-selecting mediators will not take into account subsequent changes in the circumstances of those mediators.

Subject to the above comments with respect to the mediation order, I concur fully in the remainder of the majority opinion.